# EXHIBIT A

Todd D. Carpenter
todd@lcllp.com
**LYNCH CARPENTER, LLP**
1234 Camino Del Mar
Del Mar, CA 92014
Tel: (619) 762-1900
Fax: (858) 313-1850

*Attorneys for Plaintiff and the Class*
*(Additional Counsel listed in signature block)*

Electronically
FILED
by Superior Court of California, County of San Mateo
ON 4/9/2024
By /s/ Hessen Ladcani
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN MATEO**

| | |
|---|---|
| PHYLLIS NICHOLS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware corporation,<br><br>Defendant. | Case No.: 24-CIV-02124<br><br>Assigned to:<br>Department:<br>Complaint Filed:<br><br>**CLASS ACTION COMPLAINT - JURY TRIAL DEMANDED**<br><br>**1. VIOLATION OF ILLINOIS GENETIC INFORMATION PROTECTION ACT, 410 ILCS 513/1 *et seq.*** |

Plaintiff Phyllis Nichols brings this Class Action Complaint on behalf of herself and all others similarly situated individuals against Meta Platforms, Inc. ("Meta" "Facebook" or "Defendant"), for its violations of the Illinois Genetic Information Privacy Act, 410 ILCS 513/1, *et seq.* ("GIPA"), and to obtain redress for persons injured by its conduct. Plaintiff alleges the following based on personal knowledge as to Plaintiff's own experiences, and as to all other matters, upon information and belief, including an investigation conducted by Plaintiff's attorneys.

## NATURE OF THE ACTION

1. This case concerns the compelled disclosure of the identities of thousands of individuals who were subjected to genetic tests and related other personally identifying information (collectively, "Private Information") by Defendant Meta Platforms, Inc.

2. Plaintiff Phyllis Nichols brings this lawsuit on behalf of all similarly situated persons to address Defendant's forced compulsion of her Private Information that was specially entrusted to a genetic services company, GEDmatch.com ("GEDmatch"), and yet was intercepted by Defendant.

3. Defendant's forced compulsion of Plaintiff's and Class members' confidential Private Information was not accidental. Rather, Defendant actively chose to compel the disclosure of Private Information contained in Plaintiff's and Class members' private communications, through its sophisticated online tracking technologies and the agreements it entered into with third parties, including GEDmatch.

4. Genetic information about a person, including the fact that someone took a genetic test, is among the most confidential and sensitive information in our society, and the mishandling of such information can have serious consequences, including heightened risks for discrimination in the workplace, denial of insurance coverage, and data exposures leading to irreversible privacy harms.

5. In enacting GIPA, the Illinois legislature recognized that "[d]espite existing laws, regulations, and professional standards which require or promote voluntary and confidential use of genetic testing information, many members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law or will be used in a discriminatory manner." See 410 ILCS 513/5(2).

6. Recognizing these concerns, Illinois implemented the Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/1, *et seq*., to protect the privacy of individuals' genetic testing information.

7. GIPA provides that genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized in writing by that individual to receive the information. See 410 ILCS 513/15(a).

8. GIPA further provides that no person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test. See 410 ILCS 513/30(a).

9. In other words, GIPA's requirements bestow a right to privacy to not be identified for having a genetic test performed, a right to privacy to their genetic information, and a right to prevent the disclosure of such information without their consent.

10. Defendant owns and controls Facebook, a social networking site, and Facebook Business Tools, a suite of analytical tools used to generate highly targeted online advertising.

11. Defendant's Facebook Pixel ("Pixel"), a piece of tracking code, is embedded on thousands of websites, including that of non-party GEDmatch. GEDmatch is an online database that collects genetic information and other personal information and allows users to analyze and compare such data from thousands of users.

12. Plaintiff and other Class members who used GEDmatch and uploaded their DNA files thought they were communicating only with GEDmatch. Unbeknownst to Plaintiff and Class members, however, Defendant's Pixel surreptitiously intercepts GEDmatch visitors' communications, including Private Information consisting of the identities of individuals who have been subjected to genetic tests—information that is protected under GIPA. In other words, Defendant compelled the disclosure of GEDmatch visitors' information, including protected Private Information.

13. Operating as designed by Defendant, the Pixel allows the Private Information that Plaintiff and Class members submit to GEDmatch to be unlawfully obtained by Defendant alongside the individual's unique and persistent Facebook ID ("FID") and IP address.[1]

[1] The Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform

14. A pixel is a piece of code that "tracks the people and [the] type of actions they take"[2] as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), among other things.

15. By default, the Facebook Pixel uses both first-party and third-party cookies to transmit website visitors' information to Facebook, and Facebook's Conversions Application Programming Interface ("CAPI") is automatically implemented when websites—such as GEDmatch—install the Pixel on their Website servers.[3] Thus, Defendant used first-party cookies, third-party cookies, and CAPI to intercept GEDmatch users' Private Information.

16. Unlike the Facebook Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook via the user's web browser, CAPI does not transmit any information via the web browser. Instead, CAPI tracks the user's website interactions and communications, records and stores that information on the website owner's servers, and then transmits the data to Facebook directly from the website owner's servers.[4, 5] Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[6]

---

websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited March 29, 2024).

[2] *Retargeting*, FACEBOOK, https://www.facebook.com/business/goals/retargeting (last visited March 20, 2024).

[3] "CAPI works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See How to Implement Facebook Conversions API,* FETCH&FUNNEL, https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited March 20, 2024).

[4] *What is the Facebook Conversions API and how to use it*, https://revealbot.com/blog/facebook-conversions-api/ (last visited March 20, 2024).

[5] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel.... This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", *Conversions API,* META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited March 20, 2024).

[6] *About Conversions API,* META BUSINESS HELP CENTER https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited March 20, 2024).

17. Because CAPI is located on the website owner's servers and not the website user's browser, it allows Defendant to collect website users' information even if the user employs ad blockers or other denials of consent.

18. Meta routinely uses the Facebook Pixel and CAPI to collect data, including Private Information, to build profiles for the purposes of retargeting and future marketing. Meta uses Plaintiff's and Class members' Private Information to create targeted advertisements based on the information Plaintiff and the Class members shared with GEDmatch.

19. The Private Information that Defendant compelled via the Facebook Pixel and CAPI on GEDmatch's servers included statutorily protected information of the Plaintiff and the Class members that they had been subjected to a genetic test as set forth by the GIPA.

20. Specifically, Defendant Meta compelled the disclosure of Plaintiff's and Class members' Private Information when it entered into contracts with its customers (i.e. GEDMatch) which required them to disclose web traffic and user information, including the disclosure of all actions taken on the customers' website in exchange for such customers' ability to use its Facebook Pixel technology. As a result of the communications compelled by Defendant via its Facebook Pixel and CAPI, Meta and its other advertising customers are better able to target individuals with advertisements. Thus, Defendant's use of Facebook Pixel, and the information compelled from individuals through its use, permits Defendant's customers, in this case GEDmatch, to better target individuals with ads on Facebook (or other Meta products like Instagram). In exchange, Meta and subsidiary Facebook receive more advertisement dollars since they're better able to target individuals.

21. Reasonable persons simply do not anticipate that their confidential information will be intercepted by an unauthorized third party – let alone Meta, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue when they are interacting with a completely different company. Meta's creativity with respect to collection of confidential information, including the Private Information described herein, has only increased since Apple tightened its iOS privacy settings.[7]

[7] *Facebook says Apple iOS privacy change will result in $10 billion revenue hit this year*, https://www.cnbc.com/2022/02/02/facebook-says-apple-ios-privacy-change-will-cost-10-billion-this-year.html (last visited March 23, 2024).

Neither Plaintiff nor any other Class member signed a written authorization permitting Meta to collect their Private Information.

22. And as recently noted by the Hon. William J. Orrick in a decision concerning the use of the Facebook Pixel by healthcare organizations,

> "[o]ur nation recognizes the importance of privacy in general and health information in particular: the safekeeping of this sensitive information is enshrined under state and federal law. The allegations against Meta are troubling: plaintiffs raise potentially strong claims on the merits and their alleged injury would be irreparable if proven."[8]

23. Consequently, Plaintiff brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described therein.

24. Despite willfully and intentionally inserting the Facebook Pixel and CAPI into various websites and servers including those of GEDmatch, Defendant never disclosed to Plaintiff or Class members that it obtained their sensitive and confidential communications including their Private Information. Plaintiff and the members of the Class were unaware that their Private Information was being surreptitiously compelled and intercepted by Facebook so it could be used for targeted advertising and marketing purposes.

25. As a result of Defendant's conduct, Plaintiff seeks to remedy these harms and brings a cause of action for violations of GIPA, 410 ILCS 513/1, *et seq.*

**JURISDICTION AND VENUE**

26. This Court has subject-matter jurisdiction over this action pursuant to Cal. Code Civ. Proc. § 410.10 and Article VI, § 10 of the California Constitution.

27. Plaintiff has standing to bring this action pursuant to the Illinois Genetic Information Privacy Act, 410 ILCS 513/1, *et seq.* ("GIPA").

28. This Court has personal jurisdiction over Defendant and venue is proper in this Court because Defendant maintains its headquarters Menlo Park, California and thus resides in this County, and because and a substantial part of the events giving rise to Plaintiff's claims occurred in this County.

---

[8] *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *1 (N.D. Cal. Dec. 22, 2022).

## THE PARTIES

29. Plaintiff Phyllis Nichols is a natural person and a resident of the State of Illinois.

30. Meta Platforms, Inc. ("Meta") is a corporation organized under the laws of Delaware with its principal place of business located at 1601 Willow Road, Menlo Park, California 94025.

## FACTUAL ALLEGATIONS

### A. Illinois' Genetic Information Privacy Act (GIPA)

31. The genomic revolution of recent decades has brought with it great advancements in biological sciences and medicine. Modern genomic technologies allow individuals to gather genealogical information about themselves and their relatives, to discover their genetic predisposition(s) for diseases before any symptoms manifest, and in some cases to prevent and treat such diseases.

32. These and other benefits of genomic science have coincided with a rapid decline in the cost of genetic testing. Since the turn of the 21st century, the cost of collecting and analyzing a complete individual human genome has fallen from more than $100,000,000 in 2001 to less than $1,000 in 2022.[9] Despite the benefits to science and health care that could be gained from increased access to genetic testing, the Centers for Disease Control ("CDC") expressed counterbalancing concerns related to genetic privacy as early as 1996.[10]

33. As recognized by the CDC and the Illinois Legislature, progress in the field of genomics does not come without risk, and as the benefits and accessibility of genetic testing have grown, so too has the potential for abuse and discrimination. To address these and other concerns related to the misuse of genetic information, Illinois and other states regulate the collection, use, and disclosure of such information.

34. The Illinois Legislature enacted GIPA because "[t]he public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information." 410 ILCS 513/5(3).

---

[9] www.genome.gov/about-genomics/fact-sheets/DNA-Sequencing-Costs-Data.

[10] Board on Biology National Research Council. *Privacy Issues in Biomedical and Clinical Research: Proceedings of Forum on November 1, 1997* (Washington D.C., National Academy Press, 1997) 1.

35. The Illinois General Assembly cautioned, however, that "a key component of health information privacy" is "[l]imiting the use or disclosure of, and requests for, protected health information to the minimum necessary to accomplish an intended purpose." 410 ILCS 513/5(5).

36. GIPA defines "genetic information" as information pertaining to: (i) the individual's genetic tests; (ii) the genetic tests of family members of the individual; (iii) the manifestation of a disease or disorder in family members of such individual; or (iv) any request for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by the individual or any family member of the individual.

37. GIPA provides that genetic testing and information derived from genetic testing is "confidential and privileged and may be released only to the individual tested and to persons specifically authorized." 410 ILCS 513/15(a).

38. GIPA further provides that no person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test. See 410 ILCS 513/30(a).

39. In other words, GIPA's requirements bestow a right to not be identified for having a genetic test performed, a right to privacy to their genetic information, and a right to prevent the disclosure of such information without consent.

40. Under GIPA, persons such as Defendant, may not compel the disclosure of the identity of any person upon whom a genetic test is performed ("Private Information") or information derived from genetic testing, unless specifically authorized in writing by the individual whose personal identity and/or genetic information is being disclosed. *See* 410 ILCS 513/15(a), 410 ILCS 513/30(a).

41. As alleged herein, the illegal compulsion of thousands of Illinois residents' Private Information via the Meta Pixel and CAPI without informed written consent violated 410 ILCS 513/30(a) of GIPA.

**B. The GEDmatch.Com Website**

42. GEDmatch is a company that provides DNA comparison services and tools, and operates the website GEDmatch.com.

43. GEDmatch advertises that GEDmatch.com is "the place to explore your family history by matching DNA data you can get from a genetic DNA testing kit company like 23andMe or AncestryDNA."[11]

44. To use GEDmatch.com, users take a genetic test (from a variety of companies or providers) and download the results of that test to a standard DNA file—*i.e.*, a compressed ZIP file containing a full description of the user's genetic information.[12] Next, users upload the DNA file to the GEDmatch website for processing. Within 24 hours, users can access analytical tools that compare their own genetic information to other DNA files within the GEDmatch database.[13], [14]

45. GEDmatch tells its users that "your privacy and security are paramount."[15] To reassure users about the privacy of information submitted on its site, GEDmatch encourages users to use aliases and anonymous email addresses when using the site.[16]

46. However, unbeknownst to GEDmatch users, Defendant's Facebook Pixel operates on GEDmatch.com in the background pursuant to an undisclosed written agreement between Defendant and GEDmatch. By virtue of such agreement Meta compelled the disclosure of users' identities and the fact that they were subjected to genetic tests. Not only that, such information is also associated with all other Personally Identifiable Information in Defendant's possession.

**C. Defendant's Facebook Pixel and Business Tools**

47. Meta operates Facebook, the world's largest social media company, and generates most of its revenue by selling advertising space. Unlike traditional media where advertisements must appeal to broad demographics, Meta emphasizes that its advertising space can be targeted to specific Facebook users.

---

[11] https://www.GEDmatch.com/why-join/ (last visited Mar. 20, 2024).

[12] *See, e.g.,* Downloading DNA Data, Ancestry.com, https://support.ancestry.com/s/article/Downloading-DNA-Data?language=en_US (last visited Mar. 20, 2024).

[13] "Introduction to GEDmatch: How to Get Started, Upload Your DNA, Find Relatives, Find Matches," GEDmatch, https://www.youtube.com/watch?v=_NduRUO1GMw&t=53s (last visited Mar. 20, 2024).

[14] "How it Works, Find Family Members From Around the World Using DNA Matching: https://www.gedmatch.com/how-it-works/ (last visited March 23, 2024).

[15] *Is GEDmatch Safe*?, GEDmatch, https://www.GEDmatch.com/privacy-security/ (last visited Mar. 21, 2024).

[16] *Id.*

48. To support its targeted advertising business, Meta encourages and promotes entities and website owners, such as GEDmatch, to utilize "Business Tools" to gather, identify, target, and market products and services to individuals. Advertisers can also build "Custom Audiences," which helps them reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website." With Custom Audiences, advertisers can target existing customers directly and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities." Unlike Core Audiences, Custom Audiences and Lookalike Audiences are only available if the advertiser has sent its underlying data to Facebook. This data can be supplied to Facebook by manually uploading contact information for customers or by utilizing Facebook's "Business Tools."

49. Facebook's Business Tools, including the Facebook Tracking Pixel ("Pixel" or "Facebook Pixel") and Conversions API (CAPI), are bits of code that web developers can integrate into their webpages, mobile applications, and servers, and which allow Facebook to intercept website visitors' activity and collect information, including sensitive Private Information.

50. Meta's Facebook Business Tools are configured to automatically capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or uploads a file. Facebook Business Tools can track additional events, including the content a visitor views or purchases they make, and Facebook's menu of "standard events" allows advertisers to choose which types of content are tracked. [17]

51. One such Business Tool is the Pixel, which is a piece of code that advertisers or website operators like GEDmatch can integrate into their website (hereinafter "Website"). As the name implies, the Facebook Pixel "tracks the people and type of actions they take." When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers. This second, secret transmission contains the original GET request that was sent to the host website and any additional data that the Facebook Pixel is configured to

[17] *About Standard and Custom Webpage(s) Events*, FACEBOOK, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* F *App Events API*, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/. (Last visited March 20, 2024).

collect. Facebook's code initiates this second transmission simultaneously as communications occur with the host website. Thus, two sets of code are automatically created as part of the browser's attempt to load and read GEDmatch's Website—GEDmatch's own code, and Meta's embedded code.

52. The Pixel tracks users as they navigate through the Website and simultaneously transmits to Facebook the users' communications with the Website, including Private Information. For example, specific actions taken on the Website are tracked and the fact that GEDMatch's users uploaded their DNA file to GEDMatch is recorded by Defendant. The Pixel also sends Facebook identifying information including a user's IP address and their unique Facebook ID ("FID").[18]

53. To further illustrate the point in more detail, take an individual who navigates to the GEDmatch website and uploads his DNA file. When that site function is activated, the individual's browser sends a GET request to GEDmatch's server requesting that server to load the particular webpage. Because GEDmatch utilizes the Facebook Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Meta's code instructs the browser to secretly duplicate the unwitting individual's communication with GEDmatch, and to transmit it to Meta's Facebook servers, alongside additional information that transcribes the communication's content and/or action taken and the individual's identity.

54. After collecting and intercepting this information, Defendant processes it, analyzes it, and assimilates it into datasets for advertisers Core Audiences and Custom Audiences.

55. Additionally, Meta's Conversion API tool works in conjunction with Facebook Pixel, and it allows a second set of information to be transmitted via the GEDmatch server.

### D. Defendant Compelled Plaintiff's and Class Members' Private Information For Its Business Purposes.

56. Unsurprisingly, Defendant does not offer its Pixel to companies like GEDmatch solely for that companies' benefit. "Data is the new oil of the digital economy,"[19] and Facebook has built its more-than $300 billion market capitalization on mining and using that 'digital oil'. Thus, the large volumes of

[18] *Meta Pixel,* META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last visited March 20, 2024)

[19] Joris Toonders, *Data Is the New Oil of the Digital Economy*, WIRED, https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/ (last visited March 20, 2024).

Private Information Defendant captured from GEDmatch are actively viewed, examined, analyzed, curated, and used by the company. Facebook compels and acquires the raw data to transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. Indeed, Facebook offers the Pixel free of charge[20] and the price that website owners pay for the Pixel is the data that it allows Facebook to collect.

57. Defendant Meta achieves such compulsion of mass data through its contracts with companies like GEDMatch. Such contracts require that all web traffic data, including all user information and actions taken on GEDMatch, be tracked by the Facebook Pixel and transmitted to Defendant.

58. This is worrying because such compelled data often includes or is associated with personal identities. Facebook describes itself as a "real identity platform,"[21] meaning users are allowed only one account and must share "the name they go by in everyday life."[22] To that end, when creating an account, users must provide their first and last name, date of birth, and gender.[23] Facebook's history of surreptitiously gathering other irreplaceable "identity" information like biometrics is also well documented.[24]

59. This is crucial to Facebook, because it sells its advertising space by emphasizing its ability to target users.[25] Facebook is especially effective at targeting users because it surveils user activity both on and off its own site.[26] This allows Facebook to make inferences about users beyond what they explicitly disclose, including their "interests," "behavior," and "connections."[27] Facebook compiles this

---

[20] *Facebook Pixel: What It Is and Why You Need It*, https://seodigitalgroup.com/facebook-pixel/ (last visited March 20, 2024).

[21] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[22] *Community Standards, Part IV Integrity and Authenticity*, META TRANSPARENCY CENTER https://www.facebook.com/communitystandards/integrity_authenticity (last visited March 20, 2024).

[23] *Sign Up*, FACEBOOK, https://www.facebook.com/ (last visited March 20, 2024).

[24] *Facebook's $650M BIPA settlement 'a make-or-break moment*, https://iapp.org/news/a/facebooks-650m-bipa-settlement-a-make-or-break-moment/ (last visited March 23, 2024).

[25] *Why Advertise on Facebook, Instagram, and Other Meta Technologies*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/205029060038706 (last visited March 20, 2024).

[26] *About Meta Pixel*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited March 20, 2024).

[27] *Ad Targeting: Help your ads find the people who will love your business*, META ADS https://www.facebook.com/business/ads/ad-targeting (last visited March 20, 2024).

information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[28]

60. Advertisers can also build "Custom Audiences,"[29] which helps them reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[30] With Custom Audiences, advertisers can target existing customers directly. They can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[31]

61. Facebook does not merely collect information gathered by the Pixel and store it for safekeeping on its servers without ever viewing or accessing the information. Instead, in accordance with the purpose of the Pixel to allow Facebook to create Core, Custom, and Lookalike Audiences for advertising and marketing purposes, Facebook viewed, processed, and analyzed Plaintiff's and Class members' confidential Private Information. Upon information and belief, such viewing, processing, and analyzing was performed by computers and/or algorithms programmed and designed by Facebook employees at the direction and behest of Facebook.

62. Facebook receives over 4 petabytes[32] of information every day and must rely on analytical tools designed to view, categorize, and extrapolate the data to augment human effort.[33] This process is known as "data ingestion" and allows "businesses to manage and make sense of large amounts of data."[34]

---

[28] *Easier, More Effective Ways to Reach the Right People on Facebook*, META CORE AUDIENCES, https://www.facebook.com/business/news/Core-Audiences (last visited March 20, 2024).

[29] *About Custom Audiences*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited March 20, 2024).

[30] *Ad Targeting, Help your ads Find the People Who Will Love Your Business*, META ADS, https://www.facebook.com/business/ads/ad-targeting (last visited March 20, 2024).

[31] *About Lookalike Audiences*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited March 20, 2024).

[32] A petabyte is equal to one million gigabytes (1,000,000 GB).

[33] https://medium.com/@srank2000/how-facebook-handles-the-4-petabyte-of-data-generated-per-day-ab86877956f4. Facebook employees would not be able to view each piece of data individually – millions of them per second – without the aid of technology. Just as a microscope or telescope allows the user to see very small or very distant objects by zooming in, however, Facebook's big data management software allows the company to see all this data at once by zooming out.

[34] https://scaleyourapp.com/what-database-does-facebook-use-a-1000-feet-deep-dive/. Facebook uses ODS, Scuba, and Hive to manage its massive data stores. These technologies are not traditional

63. By using data ingestion tools, Facebook can rapidly translate the information it receives from the Pixel to display relevant ads to consumers. For example, if a consumer visits a retailer's webpage and places an item in their shopping cart without purchasing it, the next time the shopper visits Facebook, an ad for that item will appear on the shopper's Facebook page.[35] This evidences the fact that Facebook views and categorizes data as they are received from the Pixel.

64. Moreover, even if Facebook eventually deletes or anonymizes sensitive information that it receives, it must first view that information to identify it as containing sensitive information suitable for removal. Accordingly, there is a breach of confidentiality the instant the information is disclosed or received without authorization. As described by the HHS Bulletin:

> It is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place **and** requires that there is an applicable Privacy Rule permission for disclosure.

(emphasis in original).

### E. Plaintiff's and Class Members' Intercepted Private Communications were Linked to their Individual Facebook Profiles.

65. The user information that Defendant compelled and intercepted from GEDmatch and other companies was transmitted alongside other information that reveals a particular user's identity.

66. Every Facebook user has a unique and persistent Facebook ID ("FID") that is associated with their Facebook profile and individual account, and Facebook places a cookie containing the user's FID ("c_user" cookie) on their device when they log into Facebook.

67. The FID is categorized as a third-party cookie, and it identifies a particular person and their actions or communications with a website, such as www.GEDmatch.com, whenever the owner of that website has installed the Facebook Pixel.

---

databases; they are specialized databases for big data designed to process data specifically for analysis—"such as [viewing] hidden patterns, correlations, market trends and customer preferences."

[35] *A Complete Guide to Facebook Tracking for Beginners*, OBERLO, Oct. 5, 2021, https://www.oberlo.com/blog/facebook-pixel.

68. When a person visits a website that is hosting the Pixel, the Pixel begins "listening in," much like a traditional wiretap, as soon as the website loads. The Pixel lies hidden within the page, waiting to be triggered.

69. Thus, the Pixel was triggered each time Plaintiff and Class members communicated with GEDmatch, in the form of HTTP Requests to the GEDmatch server. Upon triggering of the Pixel, the Facebook Pixel secretly intercepted the user's communications at the same time the message was dispatched to GEDmatch. Thus, two simultaneous communications originate from a user's browser once the user initiates an action GEDmatch: one, as intended, to GEDmatch, and a second, undetectable to and unknown by the user, to Facebook.

70. Defendant did not inform Plaintiff and Class members that it would intercept and compel the disclosure of information communicated to GEDmatch, including their Private Information.

### F. Plaintiff Phyllis Nichols's Private Information Was Compelled by Defendant's Tools on the GEDmatch Website

71. In 2021, Plaintiff Nichols uploaded her DNA file to the GEDmatch Website. In doing so, Plaintiff communicated information relating to her identity and, crucially, the fact that she had been the subject of a genetic test—all of which consist of Private Information and is protected under GIPA. Without her knowledge or permission, Defendant compelled the disclosure of this Private Information from GEDMatch and thus received the contents of those communications.

72. Plaintiff reasonably expected that her communications with GEDmatch via the Website were confidential, solely between herself and GEDmatch, and that such communications would not be compelled and transmitted to or intercepted by any third party.

73. Plaintiff has an active Facebook account that she accesses through her phone and desktop computer. Plaintiff's Facebook account contains information that can personally identify her, including her name.

74. Because the GEDmatch Website utilizes the Facebook Pixel, the Website's Source Code sent a secret set of instructions back to Plaintiff's browser—which effectively acted as a wiretap—

causing the Pixel to send Plaintiff's FID, and the webpage's URL, and the contents of her communications to Defendant (including Private Information contained within those communications).

75. Specifically, when Plaintiff Nichols uploaded her DNA file to the GEDmatch Website, and by operation of Facebook's agreement with GEDmatch and through the Pixel, Defendant compelled the disclosure of Plaintiff's communications with GEDmatch, including the fact that she uploaded her DNA file and her identity.

76. Stated differently, Meta surreptitiously intercepted Plaintiff's Private Information as she used the GEDmatch Website. Additionally, the information intercepted by Facebook via the Pixel included Plaintiff's Facebook ID, linking her communications with her Facebook profile.

77. Defendant facilitated these compulsions and interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached its obligations under GIPA.

78. Upon information and belief, Facebook also received Plaintiff's information directly through the Conversions API, which established a server-to-server data transmission from GEDmatch's Website server.

79. Plaintiff has a continuing interest in ensuring that future communications with GEDmatch are protected and safeguarded from future unauthorized compulsions and disclosures, and that Defendant ceases its practice of forcing the disclosure of Private Information from GEDmatch.

80. Thus, as a result of Defendant compelled the disclosure of the identities of thousands of Illinois consumers who had a genetic test performed without their written consent, including that of Plaintiff and the other Class members, in violation of GIPA.

## CLASS ACTION ALLEGATIONS

81. Plaintiff brings this action on behalf of a Class and Subclass of similarly situated individuals, pursuant to Cal. Code Civ. Proc. § 382, defined as follows:

> **Illinois Class:** All Illinois individuals who, during the applicable statute of limitations, (i) had a Facebook account; and (ii) whose Private Information was transmitted by the Facebook Pixel and other related technology without their authorization.

> **GEDmatch Subclass:** All Illinois individuals who, during the applicable statute of limitations, (i) had a Facebook account; and (ii) whose Private Information was transmitted by the Facebook Pixel and other related technology from GEDmatch's Website without their authorization.

82. Plaintiff reserves the right to modify the class definitions or add sub-classes as necessary prior to filing a motion for class certification.

83. Excluded from the Class and Subclass are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

84. <u>Numerosity/Ascertainability</u>. Members of the Class and Subclass are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class and Subclass members is unknown to Plaintiff currently. However, it is estimated that there are thousands of individuals in the Class and Subclass. The identity of such membership is readily ascertainable from Defendant's records and non-party records, including the records of GEDmatch.

85. <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class and Subclass because Plaintiff used the GEDmatch Website and had her Private Information intercepted by Defendant's Facebook Pixel and disclosed to third-party advertisers without her express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class and Subclass members.

86. <u>Adequacy</u>. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class and Subclass members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class and Subclass members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class and Subclass members.

87. <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest</u>. Questions of law and fact common to the Class and Subclass members predominate over questions that

may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and Subclass. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class and Subclass:

(a) Whether Defendant's conduct is subject to GIPA;

(b) Whether Defendant surreptitiously acquired Plaintiff's and the Class and Subclass members' Private Information;

(c) Whether Defendant discloses Private Information to advertisers and/or other third parties;

(d) Whether Defendant obtained written authorization from Plaintiff and the other Class and Subclass members before disclosing their Private Information;

(e) Whether Defendant's violations of GIPA were willful or reckless;

(f) Whether Defendant's violations of GIPA were negligent;

(g) Whether Plaintiff and the Class and Subclass members are entitled to damages and injunctive relief.

88. <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CAUSE OF ACTION

**Violation of the Illinois Genetic Information Privacy Act, 410 ILCS 513/1, et seq.**
**(On behalf of Plaintiff and the Class and Subclass)**

89. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the proposed Class and Subclass.

90. Defendant Meta Platforms, Inc. is a corporation and, therefore, a "person" under 410 ILCS 513/10.

91. The information that Defendant obtained from Plaintiff and the Class and Subclass is the type of information protected by GIPA. 410 ILCS 513/10.

92. GIPA states that no person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test. See 410 ILCS 513/30(a).

93. Plaintiff and the members of the Class and Subclass are individuals who uploaded their DNA data to GEDmatch.

94. Defendant Meta, through the use of its Facebook Pixel and CAPI, then obtained Plaintiff's and Class and Subclass members' Private Information which consists of the fact that they uploaded their genetic information and had a genetic test performed and their identities.

95. Crucially, this information was compelled by Defendant Meta when it entered into contracts with its customers (i.e. GEDMatch) to permit the disclosure of all web traffic and all user information, including the disclosure of all actions taken on their customers' website, for Defendant's analytics and advertising business.

96. In other words, Defendant compelled the disclosure of Plaintiff's and the other Class and Subclass members' identities who had been the subject of genetic tests. See 410 ILCS 513/30(a).

97. Defendant failed to obtain written authorization from Plaintiff or the members of the Class and Subclass to obtain their Private Information, as required by 410 ILCS 513/30(a) and 410 ILCS 513/35.

98. Plaintiff and the other Class members have been aggrieved by Defendant's violations of their statutorily protected rights to privacy in their genetic information as set forth in GIPA when Defendant compelled the disclosure of their identities without their consent.

99. Defendant's violations of GIPA, as set forth herein, were knowing and willful, or were at least in reckless disregard of the statutory requirements. Alternatively, Defendant negligently failed to comply with GIPA.

100. On behalf of herself and the Class and Subclass, Plaintiff seeks: (1) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with GIPA's requirements; (2) statutory damages of $15,000 for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(a)(2) or, in the alternative, statutory damages of $2,500 for each negligent violation of GIPA pursuant to 410 ILCS 513/40(a)(1); and (3) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(a)(3).

**RELIEF REQUESTED**

Plaintiff, on behalf of herself and the proposed Class and Subclass, respectfully requests that the Court enter an Order:

(a) Certifying this action as a class action and appointing Plaintiff and Plaintiff's counsel to represent the Class;

(b) Declaring that Defendant's actions violate GIPA, 410 ILCS 513/1, *et seq.*;

(c) Awarding Plaintiff and the Class statutory damages of $15,000.00 for each and every intentional and /or reckless violation of GIPA pursuant to 410 ILCS 513(40)(a)(2), or alternatively, statutory damages of $2,500 for each and every violation pursuant to 410 ILCS 513(40)(a)(1) if the Court finds that Defendant's violations were negligent;

(d) Awarding injunctive and other equitable relief as is necessary pursuant to 410 ILCS 513(40)(a)(4) to protect the interests of the Class;

(e) Awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and costs of other litigation expenses, pursuant to 410 ILCS 513/40(a)(3);

(f) Awarding Plaintiff and the Class and Subclass pre- and post-judgment interest, to the extent allowable; and

(g) Awarding such other and further relief as equity and justice may require.

///

///

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Class, demand a trial by jury for all the claims asserted in this Complaint so triable.

Dated: April 9, 2024

**LYNCH CARPENTER, LLP**

By: */s/ Todd D. Carpenter*
Todd D. Carpenter (CA Bar No. 234464)
todd@lcllp.com
1234 Camino Del Mar
Del Mar, CA 92014
Tel: (619) 762-1900
Fax: (858) 313-1850

**LYNCH CARPENTER, LLP**
Katrina Carroll (pro hac vice forthcoming)
katrina@lcllp.com
Kyle Shamberg (pro hac vice forthcoming)
kyle@lcllp.com
111 W. Washington St., Ste. 1240
Chicago, IL 60602
Tel.: (312) 750-1265

David L. Gerbie (pro have vice forthcoming)
dgerbie@mcgpc.com
Andrew T. Heldut (pro have vice forthcoming)
aheldut@mcgpc.com
Joseph Dunklin (pro have vice forthcoming)
jdunklin@mcgpc.com
**MCGUIRE LAW, P.C.**
55 W. Wacker Drive, 9th Floor
Chicago, IL 606061
Tel.: (312) 893-7002

Jonathan M. Jagher (pro hac vice forthcoming)
jjagher@fklmlaw.com
**FREED KANNER LONDON**
**& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel. (610) 234-6486

*Attorneys for Plaintiffs and the Putative Classes*