1  Todd D. Carpenter (SBN 234464)
   todd@lcllp.com
2  **LYNCH CARPENTER, LLP**
   1234 Camino del Mar
3  Del Mar, CA 92014
   Tel:    (619) 762-1900
4  Fax:    (818) 313-1850

5  *Attorneys for Plaintiffs and the Putative Class and Subclasses*
6  *(Additional Counsel listed in signature block)*

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                     OAKLAND DIVISION

11 | PHYLLIS NICHOLS, ROBIN COOK, and     | Case No.: 4:24-cv-02914-JSW
   | LAWRENCE NOVIDA on behalf of         |
12 | themselves and all others similarly situated, | **AMENDED CLASS ACTION COMPLAINT**
13 |                    Plaintiffs,       |
   |                                      | Honorable Judge Jeffrey S. White
14 |           v.                         |
15 | META PLATFORMS, INC., a Delaware     |
   | corporation,                         |
16 |                                      | **JURY TRIAL DEMANDED**
   |                    Defendant.        |
17

18

19

20

21

22

23

24

25

26

27

---

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Phyllis Nichols, Robin Cook, and Lawrence Novida bring this Amended Class Action Complaint on behalf of themselves and all others similarly situated individuals against Meta Platforms, Inc. ("Meta" "Facebook" or "Defendant"), alleging claims for or arising under: 1) the Illinois Genetic Information Privacy Act, 410 ILCS 513/1, *et seq*. ("GIPA"); 2) common law invasion of privacy—Intrusion Upon Seclusion; 3) Unjust Enrichment; 4) the California Invasion of Privacy Act, Cal. Penal Code §§ 631-32 ("CIPA"); 5) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; 6) Invasion of Privacy Under California's Constitution; and 7), alternatively to their unjust enrichment claim, breach of contract. Plaintiffs allege the following based on personal knowledge as to Plaintiffs' own experiences, and as to all other matters, upon information and belief, including an investigation conducted by Plaintiffs' attorneys.

## NATURE OF THE ACTION

1.     This case concerns the compelled disclosure of the identities of thousands of individuals who were subjected to genetic tests and related other personally identifying information (collectively, "Private Information") by Defendant Meta Platforms, Inc.

2.     Plaintiffs Phyllis Nichols, Robin Cook, and Lawrence Novida bring this lawsuit on behalf of all similarly situated persons to address Defendant's forced compulsion of her Private Information that was specially entrusted to a genetic services company, GEDmatch.com ("GEDmatch"), and yet was quietly intercepted by Defendant without Plaintiffs' consent or knowledge.

3.     Defendant's forced compulsion of Plaintiffs' and Class members' confidential Private Information was not accidental. Rather, Defendant actively chose to compel the disclosure of Private Information contained in Plaintiffs' and Class members' private communications through its sophisticated online tracking technologies and the agreements it entered into with third parties, including GEDmatch.

4.     Genetic information about a person, including the fact that someone took a genetic test, is among the most confidential and sensitive information in our society, and the mishandling of such information can have serious consequences, including heightened risks for discrimination in the workplace, denial of insurance coverage, and data exposures leading to irreversible privacy harms.

5.      In enacting GIPA, the Illinois legislature recognized that "[d]espite existing laws, regulations, and professional standards which require or promote voluntary and confidential use of genetic testing information, many members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law or will be used in a discriminatory manner." *See* 410 ILCS 513/5(2).

6.      Recognizing these concerns, Illinois implemented the Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/1, *et seq*., to protect the privacy of individuals' genetic testing information.

7.      GIPA provides that genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized in writing by that individual to receive the information. *See* 410 ILCS 513/15(a).

8.      GIPA further provides that no person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test. *See* 410 ILCS 513/30(a).

9.      In other words, GIPA's requirements bestow a right to privacy to not be identified for having a genetic test performed, a right to privacy to their genetic information, and a right to prevent the disclosure of such information without their consent. Numerous provisions of California statutory and common law equally protect Plaintiffs' right to privacy of this sensitive information.

10.     Defendant owns and controls Facebook, a social networking site, and Facebook Business Tools, a suite of analytical tools used to generate highly targeted online advertising.

11.     Defendant's Facebook Pixel ("Pixel"), a piece of tracking code, is embedded on thousands of websites, including that of non-party GEDmatch. GEDmatch is an online database that collects genetic information and other personal information and allows users to analyze and compare such data from thousands of users.

12.     Plaintiffs and other Class members who used GEDmatch and uploaded their DNA files thought they were communicating only with GEDmatch. Unbeknownst to Plaintiffs and Class members, however, Defendant's Pixel surreptitiously intercepts GEDmatch visitors' communications, including Private Information consisting of the identities of individuals who have been subjected to genetic tests

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

and, upon information and belief, the results of the genetic testing, information that is protected under GIPA. In other words, Defendant compelled the disclosure of GEDmatch visitors' information, including protected Private Information.

13.     Operating as designed by Defendant, the Pixel allows the Private Information that Plaintiffs and Class members submit to GEDmatch to be unlawfully obtained by Defendant alongside the individual's unique and persistent Facebook ID ("FID") and IP address.[1]

14.     A pixel is a piece of code that "tracks the people and [the] type of actions they take"[2] as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), among other things.

15.     By default, the Facebook Pixel uses both first-party and third-party cookies to transmit website visitors' information to Facebook, and Facebook's Conversions Application Programming Interface ("CAPI") is automatically implemented when websites—such as GEDmatch—install the Pixel on their website servers.[3] Thus, Defendant used first-party cookies, third-party cookies, and CAPI to intercept GEDmatch users' Private Information.

16.     Unlike the Facebook Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook via the user's web browser, CAPI does not transmit any information via the web browser. Instead, CAPI tracks the user's website interactions and communications, records and stores that information on the website owner's servers, and then transmits the data to Facebook

---

[1] The Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Aug. 21, 2024).

[2] *Retargeting*, FACEBOOK, https://www.facebook.com/business/goals/retargeting (last visited Aug. 21, 2024).

[3] "CAPI works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See How to Implement Facebook Conversions API,* FETCH&FUNNEL, https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Aug. 21, 2024).

3

directly from the website owner's servers.[4, 5] Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[6]

17.     Because CAPI is located on the website owner's servers and not the website user's browser, it allows Defendant to collect website users' information even if the user employs ad blockers or other denials of consent.

18.     Meta routinely uses the Facebook Pixel and CAPI to collect data, including Private Information, to build profiles for the purposes of retargeting and future marketing. Meta uses Plaintiffs' and Class members' Private Information to create targeted advertisements based on the information Plaintiffs and the Class members shared with GEDmatch.

19.     The Private Information that Defendant compelled via the Facebook Pixel and CAPI on GEDmatch's servers included statutorily protected information of the Plaintiffs and the Class members that they had been subjected to a genetic test as set forth by the GIPA, and as protected from disclosure by various California statutory and common laws.

20.     Specifically, Defendant Meta compelled the disclosure of Plaintiffs' and Class members' Private Information when it entered into contracts with its customers (i.e. GEDMatch), which required them to disclose web traffic and user information, including the disclosure of all actions taken on the customers' website in exchange for such customers' ability to use its Facebook Pixel technology. As a result of the communications compelled by Defendant via its Facebook Pixel and CAPI, Meta and its other advertising customers are better able to target individuals with advertisements. Thus, Defendant's use of Facebook Pixel, and the information compelled from individuals through its use, permits Defendant's customers, in this case GEDmatch, to better target individuals with ads on Facebook (or

---

[4] *What is the Facebook Conversions API and how to use it*, https://revealbot.com/blog/facebook-conversions-api/ (last visited Aug. 21, 2024).

[5] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", *Conversions API*, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited Aug. 21, 2024).

[6] *About Conversions API,* META BUSINESS HELP CENTER https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Aug. 21, 2024).

4

other Meta products like Instagram). In exchange, Meta and subsidiary Facebook receive more advertisement dollars since they're better able to target individuals.

21.     Reasonable persons simply do not anticipate that their confidential information will be intercepted by an unauthorized third party – let alone Meta, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue when they are interacting with a completely different company. Meta's creativity with respect to collection of confidential information, including the Private Information described herein, has only increased since Apple tightened its iOS privacy settings.[7] Neither Plaintiffs nor any other Class member signed a written authorization permitting Meta to collect their Private Information.

22.     And as recently noted by the Hon. William J. Orrick in a decision concerning the use of the Facebook Pixel by healthcare organizations,

> [o]ur nation recognizes the importance of privacy in general and health information in particular: the safekeeping of this sensitive information is enshrined under state and federal law. The allegations against Meta are troubling: plaintiffs raise potentially strong claims on the merits and their alleged injury would be irreparable if proven.[8]

23.     Consequently, Plaintiffs bring this action for legal and equitable remedies to address and rectify the illegal conduct and actions described therein.

24.     Despite willfully and intentionally inserting the Facebook Pixel and CAPI into various websites and servers including those of GEDmatch, Defendant never disclosed to Plaintiffs or Class members that it obtained their sensitive and confidential communications including their Private Information. Plaintiffs and the members of the Class were unaware that their Private Information was being surreptitiously compelled and intercepted by Facebook so it could be used for targeted advertising and marketing purposes.

25.     As a result of Defendant's conduct, Plaintiffs seek to remedy these harms and brings the claims set forth *infra*.

---

[7] *Facebook says Apple iOS privacy change will result in $10 billion revenue hit this year*, https://www.cnbc.com/2022/02/02/facebook-says-apple-ios-privacy-change-will-cost-10-billion-this-year.html (last visited Aug. 21, 2024).

[8] *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *1 (N.D. Cal. Dec. 22, 2022).

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**JURISDICTION AND VENUE**

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class members are citizens of a state different from Defendant.

27.     This Court has personal jurisdiction over Meta because its principal place of business is in California. Meta is also subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State, including Meta's collection of Plaintiffs' sensitive genetic data from GEDmatch and use of that data for commercial purposes. Further, Meta designed and effectuated its scheme to intercept Plaintiffs' and Class members' Private Information from California, developed and implemented its tracking technologies from within California, and implemented its terms of service from within California, which provide that California law shall govern the claims against Facebook.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because a substantial portion of the conduct described in this Amended Class Action Complaint was carried out in this District. Furthermore, Defendant Meta is headquartered in this District and subject to personal jurisdiction in this District.

**THE PARTIES**

29.     Plaintiff Phyllis Nichols is a natural person and a resident of the State of Illinois.

30.     Plaintiff Robin Cook is a natural person and a resident of the State of California.

31.     Plaintiff Lawrence Novida is a natural person and a resident of the State of California.

32.     Meta Platforms, Inc. ("Meta") is a corporation organized under the laws of Delaware with its principal place of business located at 1601 Willow Road, Menlo Park, California 94025.

/ / /

/ / /

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

**FACTUAL ALLEGATIONS**

2

    **A.**    **Illinois' Genetic Information Privacy Act (GIPA) and the Sensitivity of Genetic Information**

3

4        33.    The genomic revolution of recent decades has brought with it great advancements in

5 biological sciences and medicine. Modern genomic technologies allow individuals to gather

6 genealogical information about themselves and their relatives, to discover their genetic predisposition(s)

7 for diseases before any symptoms manifest, and in some cases to prevent and treat such diseases.

8        34.    These and other benefits of genomic science have coincided with a rapid decline in the

9 cost of genetic testing. Since the turn of the 21st century, the cost of collecting and analyzing a complete

10 individual human genome has fallen from more than $100,000,000 in 2001 to less than $1,000 in 2022.[9]

11 Despite the benefits to science and health care that could be gained from increased access to genetic

12 testing, the Centers for Disease Control ("CDC") expressed counterbalancing concerns related to genetic

13 privacy as early as 1996.[10]

14        35.    As recognized by the CDC and the Illinois Legislature, progress in the field of genomics

15 does not come without risk, and as the benefits and accessibility of genetic testing have grown, so too

16 has the potential for abuse and discrimination. To address these and other concerns related to the misuse

17 of genetic information, Illinois and other states regulate the collection, use, and disclosure of such

18 information.

19        36.    GEDMatch is a consumer-facing, online genomics company that has collected and

20 analyzed the genetic test results of millions of individuals. In exchange for genetic and personal

21 information collected directly from its users and through web-tracking technologies such as the Meta

22 Pixel, GEDMatch provides a suite of "DNA Tools" that allow its users to "compar[e]…DNA test results

23 with the most people worldwide."[11]

24

25

26    [9] *DNA Sequencing Costs: Datai,* www.genome.gov/about-genomics/fact-sheets/DNA-Sequencing-Costs-Data (last accessed Aug. 21, 2024).

27    [10] Board on Biology National Research Council. *Privacy Issues in Biomedical and Clinical Research: Proceedings of Forum on November 1, 1997* (Washington D.C., National Academy Press, 1997).

[11] GEDMatch Homepage, https://www.gedmatch.com/ (last visited Aug. 21, 2024).

37.     Among information that GEDmatch prompts Plaintiffs and Class Members to provide is their mitochondrial haplogroup and Y haplogroup, as well as the company that tested their DNA.[12] Haplogroups are genetic classifications or ancestral groupings within a population, typically defined by shared, inherited genetic markers or mutations. These markers are passed down from a common ancestor and provide insights into human populations' historical migrations and evolutionary history, helping researchers and genealogists understand the genetic relationships and ancestral origins of individuals and groups.[13]

38.     Mitochondrial haplogroup distributions display geographic diversity. For example, "in African populations, haplogroups L1, L1, L2, and L3 are mainly observed. Among them, haplogroup L3 is proposed to be the ancestor of all non-African populations, and is a common root of macrohaplogroups M and N. European haplogroups, such as H, I, J, K, S, T, U, V, W, belong to macrohaplogroup N, whereas Asian haplogroups belong to both N and M macrohaplogroups (haplogroups A, B, F, and N9 belong to macrohaplogroup N, and haplogroups M7a, M7b, M8, D, and G belong to macrohaplogroup M)."[14]

39.     A Y haplogroup is a stretch of the Y chromosome that you share with other members of your paternal line who carry a Y chromosome. Unlike other human chromosomes, the Y chromosome does not have a nearly identical partner, and so it can be traced far back into the past.[15]

40.     As such, knowledge of one's mitochondrial and Y haplogroups can provide important information about that person's ancestry, origin, ethnicity, and genetic relationships.

41.     Indeed, as the Federal Trade Commission Division of Privacy & Identity Protection cautions, "[g]enetic data reveals sensitive information not only about consumers' health, characteristics, and ancestry, but also about their families. While some other data types can be stripped of identifying characteristics, that's not necessarily the case when it comes to genetic information. Where the

---

[12] https://www.gedmatch.com/how-it-works/ (last visited Aug. 21, 2024).

[13] https://blog.23andme.com/articles/haplogroups-explained (last visited Aug. 21, 2024).

[14] Eri Miyamoto-Mikami, Noriyuki Fuku, *Variation of Mitochondrial DNA and elite athletic performance*, Sports, Exercise, and Nutritional Genomics (2019), excerpt available at https://www.sciencedirect.com/topics/biochemistry-genetics-and-molecular-biology/mitochondrial-haplogroup (last visited Aug. 21, 2024).

[15] https://www.ancestry.com/c/dna-learning-hub/y-dna (last visited Aug. 21, 2024).

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

sensitivity of the data is high, so too is the risk of harm, particularly in this era of increasing biometric surveillance."[16] For this reason, the FTC cautions that "[i]f you collect or store genetic data, you're on notice that the FTC expects security in line with the sensitivity of the data."[17] Likewise, the FTC has required genetic testing companies to obtain "affirmative express consent" – consent that precludes the use of dark patterns- for uses or disclosures of genetic data. "Companies are on notice that they shouldn't be using dark patterns to get consent."[18]

42.    Similarly, the Illinois Legislature enacted GIPA because "[t]he public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information." 410 ILCS 513/5(3).

43.    The Illinois General Assembly cautioned, however, that "a key component of health information privacy" is "[l]imiting the use or disclosure of, and requests for, protected health information to the minimum necessary to accomplish an intended purpose." 410 ILCS 513/5(5).

44.    GIPA defines "genetic information" as information pertaining to: (i) the individual's genetic tests; (ii) the genetic tests of family members of the individual; (iii) the manifestation of a disease or disorder in family members of such individual; or (iv) any request for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by the individual or any family member of the individual.[19]

45.    GIPA provides that genetic testing and information derived from genetic testing is "confidential and privileged and may be released only to the individual tested and to persons specifically authorized." 410 ILCS 513/15(a).

46.    GIPA further provides that no person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test. *See* 410 ILCS 513/30(a).

---

[16]  Elisa Jillson, *The DNA of privacy and the privacy of DNA*, FTC (January 5, 2024), https://www.ftc.gov/business-guidance/blog/2024/01/dna-privacy-privacy-dna (last visited Aug. 21, 2024).

[17] *Id.*

[18] *Id.*

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

47.     In other words, GIPA's requirements bestow a right to not be identified for having a genetic test performed, a right to privacy to their genetic information, and a right to prevent the disclosure of such information without consent.

48.     Under GIPA, persons such as Defendant, may not compel the disclosure of the identity of any person upon whom a genetic test is performed or information derived from genetic testing (i.e., "Private Information"), unless specifically authorized in writing by the individual whose personal identity and/or genetic information is being disclosed. *See* 410 ILCS 513/15(a), 410 ILCS 513/30(a).

49.     As alleged herein, the illegal compulsion of thousands of Illinois residents' Private Information via the Meta Pixel and CAPI without informed written consent violated 410 ILCS 513/30(a) of GIPA. Similarly, Meta's compelled interception of this sensitive genetic information violated a host of other California statutory and common laws.

**B.     Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites.**

50.     Consumers are skeptical and wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[20]

51.     Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[21] As such, website visitors reasonably expect that their interactions with a website would not be released to third parties unless explicitly stated.[22]

---

[20] Lance Whitney, *Data privacy is a growing concern for more consumers*, TechRepublic (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/ (last visited Aug. 21, 2024).

[21] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html (last visited Aug. 21, 2024).

[22] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, The Information Society, 38:4, 257, 258 (2022).

52.     Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

53.     A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[23]

54.     Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[24]

55.     Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software- which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[25]

### C.     The GEDmatch.com Website

56.     GEDmatch is a company that provides DNA comparison services and tools, and operates the website GEDmatch.com.

57.     GEDmatch advertises that GEDmatch.com is "the place to explore your family history by matching DNA data you can get from a genetic DNA testing kit company like 23andMe or AncestryDNA."[26]

58.     To use GEDmatch.com, users take a genetic test (from a variety of companies or providers) and download the results of that test to a standard DNA file—*i.e.*, a compressed ZIP file

---

[23] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/ consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited Aug. 21, 2024).

[24] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confused-and-feeling-lack-of-control-over-their-personal-information/ (last visited Aug. 21, 2024).

[25] Margaret Taylor, *How Apple screwed Facebook*, Wired, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook (last visited Aug. 21, 2024).
[26] https://www.GEDmatch.com/why-join/ (last visited Mar. 20, 2024).

11

containing a full description of the user's genetic information.[27] Next, users upload the DNA file to the GEDmatch website for processing. When uploading their DNA file, GEDmatch's website prompts users to also enter their mitochondrial haplogroup, Y haplogroup, and the name of the company that conducted their DNA test. Within 24 hours, users can access analytical tools that compare their own genetic information to other DNA files within the GEDmatch database.[28],[29]

59.     GEDmatch tells its users that "your privacy and security are paramount."[30] To reassure users about the privacy of information submitted on its site, GEDmatch encourages users to use aliases and anonymous email addresses when using the site.[31]

60.     However, unbeknownst to GEDmatch users, Defendant's Facebook Pixel operates on GEDmatch.com in the background pursuant to an undisclosed written agreement between Defendant and GEDmatch. By virtue of such agreement Meta compelled the disclosure of users' information, including, *inter alia*, their identities, the fact that they were subjected to genetic tests, information related to the users' genetic tests, including mitochondrial and Y haplogroups and the specific DNA test that they took, and other information relating to the users' activity on the website. Not only that, such information is also associated with all other personally identifiable information in Defendant's possession.

### D.     Defendant's Facebook Pixel and Business Tools

61.     Meta operates Facebook, the world's largest social media company, and generates most of its revenue by selling advertising space. Unlike traditional media where advertisements must appeal to broad demographics, Meta emphasizes that its advertising space can be targeted to specific Facebook users.

---

[27]  *See, e.g.,* Downloading DNA Data, Ancestry.com, https://support.ancestry.com/s/article/Downloading-DNA-Data?language=en_US (last visited Mar. 20, 2024).

[28] "Introduction to GEDmatch: How to Get Started, Upload Your DNA, Find Relatives, Find Matches," GEDmatch, https://www.youtube.com/watch?v=_NduRUO1GMw&t=53s (last visited Aug. 21, 2024).

[29] "How it Works, Find Family Members From Around the World Using DNA Matching: https://www.gedmatch.com/how-it-works/ (last visited Aug. 21, 2024).

[30] *Is GEDmatch Safe*?, GEDmatch, https://www.GEDmatch.com/privacy-security/ (last visited Mar. 21, 2024).

[31] *Id.*

62.     To support its targeted advertising business, Meta encourages and promotes entities and website owners, such as GEDmatch, to utilize "Business Tools" to gather, identify, target, and market products and services to individuals. Advertisers can also build "Custom Audiences," which helps them reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."  With Custom Audiences, advertisers can target existing customers directly and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."  Unlike Core Audiences, Custom Audiences and Lookalike Audiences are only available if the advertiser has sent its underlying data to Facebook. This data can be supplied to Facebook by manually uploading contact information for customers or by utilizing Facebook's "Business Tools."

63.     Facebook's Business Tools, including the Facebook Tracking Pixel ("Pixel" or "Facebook Pixel") and Conversions API (CAPI), are bits of code that web developers can integrate into their webpages, mobile applications, and servers, and which allow Facebook to intercept website visitors' activity and collect information, including sensitive Private Information.

64.     Meta's Facebook Business Tools are configured to automatically capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or uploads a file. Facebook Business Tools can track additional events, including the content a visitor views or purchases they make, and Facebook's menu of "standard events" allows advertisers to choose which types of content are tracked. [32]

65.     One such Business Tool is the Pixel, which is a piece of code that advertisers or website operators like GEDmatch can integrate into their website. As the name implies, the Facebook Pixel "tracks the people and type of actions they take."  When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers. This second, secret transmission contains the original GET request that was sent

---

[32]   *About Standard and Custom Webpage(s) Events*, FACEBOOK, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* F *App Events API*, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/. (Last visited Aug. 21, 2024).

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

to the host website and any additional data that the Facebook Pixel is configured to collect. Facebook's code initiates this second transmission simultaneously as communications occur with the host website. Thus, two sets of code are automatically created as part of the browser's attempt to load and read GEDmatch's website—GEDmatch's own code, and Meta's embedded code.

66. The Pixel tracks users as they navigate through the website and simultaneously transmits to Facebook the users' communications with the website, including Private Information. Upon information and belief, Facebook receives Private Information including but not limited to how long users spend on a particular web page, which buttons the users clicks, which pages they view, the text or phrases they type into various portions of the website, including their mitochondrial and Y haplogroup results from their DNA test and the kind of DNA test users took, and the fact that GEDMatch's users uploaded their DNA file to GEDMatch. The Pixel also sends Facebook identifying information including a user's IP address and their unique Facebook ID ("FID").[33]

67. To further illustrate the point in more detail, take an individual who navigates to the GEDmatch website and uploads his DNA file. When that site function is activated, the individual's browser sends a GET request to GEDmatch's server requesting that server to load the particular webpage. Because GEDmatch utilizes the Facebook Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Meta's code instructs the browser to secretly duplicate the unwitting individual's communication with GEDmatch, and to transmit it to Meta's Facebook servers, alongside additional information that transcribes the communication's content and/or action taken and the individual's identity.

68. After collecting and intercepting this information, Defendant processes it, analyzes it, and assimilates it into datasets for advertisers Core Audiences and Custom Audiences.

69. Additionally, Meta's Conversion API tool works in conjunction with Facebook Pixel, and it allows a second set of information to be transmitted via the GEDmatch server.

---

[33] *Meta Pixel,* META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last visited Aug. 21, 2024).

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**E.    Defendant Compelled Plaintiffs' and Class Members' Private Information For Its Business Purposes.**

70.    Unsurprisingly, Defendant does not offer its Pixel to companies like GEDmatch solely for those companies' benefit. "Data is the new oil of the digital economy,"[34] and Facebook has built its more-than $300 billion market capitalization on mining and using that 'digital oil'. Thus, the large volumes of Private Information Defendant captured from GEDmatch are actively viewed, examined, analyzed, curated, and used by the company. Facebook compels and acquires the raw data to transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. Indeed, Facebook offers the Pixel free of charge[35] and the price that website owners pay for the Pixel is the data that it allows Facebook to collect.

71.    Defendant Meta achieves such compulsion of mass data through its contracts with companies like GEDMatch. Such contracts require that all web traffic data, including all user information and actions taken on GEDMatch, be tracked by the Facebook Pixel and transmitted to Defendant.

72.    This is worrying because such compelled data often includes or is associated with personal identities. Facebook describes itself as a "real identity platform,"[36] meaning users are allowed only one account and must share "the name they go by in everyday life."[37]  To that end, when creating an account, users must provide their first and last name, date of birth, and gender.[38]  Facebook's history of surreptitiously gathering other irreplaceable "identity" information like biometrics is also well documented.[39]

---

[34]    Joris  Toonders,  *Data  Is  the  New  Oil  of  the  Digital  Economy*,  WIRED, https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/ (last visited Aug. 21, 2024).

[35] *Facebook Pixel: What It Is and Why You Need It*, https://seodigitalgroup.com/facebook-pixel/ (last visited Aug. 21, 2024).

[36] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[37]    *Community Standards, Part IV Integrity and Authenticity*, META TRANSPARENCY CENTER https://www.facebook.com/communitystandards/integrity_authenticity (last visited Aug. 21, 2024).

[38] *Sign Up*, FACEBOOK, https://www.facebook.com/ (last visited Aug. 21, 2024).

[39]*Facebook's $650M BIPA settlement 'a make-or-break moment*,  https://iapp.org/news/a/facebooks-650m-bipa-settlement-a-make-or-break-moment/ (last visited Aug. 21, 2024).

73.     This is crucial to Facebook, because it sells its advertising space by emphasizing its ability to target users.[40]  Facebook is especially effective at targeting users because it surveils user activity both on and off its own site.[41]  This allows Facebook to make inferences about users beyond what they explicitly disclose, including their "interests," "behavior," and "connections."[42]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[43]

74.     Advertisers can also build "Custom Audiences,"[44] which helps them reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[45]  With Custom Audiences, advertisers can target existing customers directly. They can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[46]

75.     Facebook does not merely collect information gathered by the Pixel and store it for safekeeping on its servers without ever viewing or accessing the information. Instead, in accordance with the purpose of the Pixel to allow Facebook to create Core, Custom, and Lookalike Audiences for advertising and marketing purposes, Facebook viewed, processed, and analyzed Plaintiffs' and Class members' confidential Private Information. Upon information and belief, such viewing, processing, and

---

[40] *Why Advertise on Facebook, Instagram, and Other Meta Technologies*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/205029060038706 (last visited Aug. 21, 2024).

[41] *About Meta Pixel*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Aug. 21, 2024).

[42] *Ad Targeting: Help your ads find the people who will love your business*, META ADS https://www.facebook.com/business/ads/ad-targeting (last visited March 20, 2024).

[43] *Easier, More Effective Ways to Reach the Right People on Facebook*, META CORE AUDIENCES, https://www.facebook.com/business/news/Core-Audiences (last visited Aug. 21, 2024).

[44] *About Custom Audiences*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Aug. 21, 2024).

[45] *Ad Targeting, Help your ads Find the People Who Will Love Your Business*, META ADS, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 21, 2024).

[46] *About Lookalike Audiences*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Aug. 21, 2024).

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

analyzing was performed by computers and/or algorithms programmed and designed by Facebook employees at the direction and behest of Facebook.

76.     Facebook receives over 4 petabytes[47] of information every day and must rely on analytical tools designed to view, categorize, and extrapolate the data to augment human effort.[48] This process is known as "data ingestion" and allows "businesses to manage and make sense of large amounts of data."[49]

77.     By using data ingestion tools, Facebook can rapidly translate the information it receives from the Pixel to display relevant ads to consumers. For example, if a consumer visits a retailer's webpage and places an item in their shopping cart without purchasing it, the next time the shopper visits Facebook, an ad for that item will appear on the shopper's Facebook page.[50] This evidences the fact that Facebook views and categorizes data as they are received from the Pixel.

78.     Moreover, even if Facebook eventually deletes or anonymizes sensitive information that it receives, it must first view that information to identify it as containing sensitive information suitable for removal. Accordingly, there is a breach of confidentiality the instant the information is disclosed or received without authorization. As described by the HHS Bulletin:

> It is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place **and** requires that there is an applicable Privacy Rule permission for disclosure.

(emphasis in original).

---

[47]  A petabyte is equal to one million gigabytes (1,000,000 GB).

[48]  https://medium.com/@srank2000/how-facebook-handles-the-4-petabyte-of-data-generated-per-day-ab86877956f4. Facebook employees would not be able to view each piece of data individually – millions of them per second – without the aid of technology. Just as a microscope or telescope allows the user to see very small or very distant objects by zooming in, however, Facebook's big data management software allows the company to see all this data at once by zooming out.

[49]  https://scaleyourapp.com/what-database-does-facebook-use-a-1000-feet-deep-dive/. Facebook uses ODS, Scuba, and Hive to manage its massive data stores.  These technologies are not traditional databases; they are specialized databases for big data designed to process data specifically for analysis— "such as [viewing] hidden patterns, correlations, market trends and customer preferences."

[50]  *A Complete Guide to Facebook Tracking for Beginners*, OBERLO, Oct. 5, 2021, https://www.oberlo.com/blog/facebook-pixel.

**F.      Plaintiffs' and Class Members' Intercepted Private Communications were Linked to their Individual Facebook Profiles.**

79.     The user information that Defendant compelled and intercepted from GEDmatch and other companies was transmitted alongside other information that reveals a particular user's identity.

80.     Every Facebook user has a unique and persistent Facebook ID ("FID") that is associated with their Facebook profile and individual account, and Facebook places a cookie containing the user's FID ("c_user" cookie) on their device when they log into Facebook.

81.     The FID is categorized as a third-party cookie, and it identifies a particular person and their actions or communications with a website, such as www.GEDmatch.com, whenever the owner of that website has installed the Facebook Pixel.

82.     When a person visits a website that is hosting the Pixel, the Pixel begins "listening in," much like a traditional wiretap, as soon as the website loads. The Pixel lies hidden within the page, waiting to be triggered.

83.     Thus, the Pixel was triggered each time Plaintiffs and Class members communicated with GEDmatch, in the form of HTTP Requests to the GEDmatch server. Upon triggering of the Pixel, the Facebook Pixel secretly intercepted the user's communications at the same time the message was dispatched to GEDmatch. Thus, two simultaneous communications originate from a user's browser once the user initiates an action on GEDmatch: one, as intended, to GEDmatch, and a second, undetectable to and unknown by the user, to Facebook.

84.     Defendant did not inform Plaintiffs and Class members that it would intercept and compel the disclosure of information communicated to GEDmatch, including their Private Information.

**G.      Plaintiff Phyllis Nichols' Private Information Was Compelled by Defendant's Tools on the GEDmatch Website**

85.     In 2021, Plaintiff Nichols uploaded her own DNA file to the GEDmatch website. In doing so, Plaintiff communicated information relating to her identity and her DNA results, including, crucially, the fact that she had been the subject of a genetic test—all of which consist of Private Information protected under GIPA and various statutory and common laws. Without her knowledge or permission,

Defendant compelled the disclosure of this Private Information from GEDMatch and thus received the contents of those communications.

86.     Plaintiff Nichols reasonably expected that her communications with GEDmatch via the website were confidential, solely between herself and GEDmatch, and that such communications would not be compelled and transmitted to or intercepted by any third party.

87.     Plaintiff Nichols has an active Facebook account that she accesses through her phone and desktop computer. Plaintiff's Facebook account contains information that can personally identify her, including her name.

88.     Because the GEDmatch website utilizes the Facebook Pixel, the website's Source Code sent a secret set of instructions back to Plaintiff Nichols' browser—which effectively acted as a wiretap—causing the Pixel to send Plaintiff Nichols' FID, and the webpage's URL, and the contents of her communications to Defendant (including Private Information contained within those communications).

89.     Specifically, when Plaintiff Nichols uploaded her DNA file to the GEDmatch website, and by operation of Facebook's agreement with GEDmatch and through the Pixel, Defendant compelled the disclosure of Plaintiff's communications with GEDmatch, including the fact that she uploaded her DNA file and her identity and, upon information and belief, her other interactions with the website, including how long she spent on particular web pages, which buttons she clicked on, which pages she viewed, and the text or phrases she typed into various portions of the website (such as, potentially, mitochondrial and Y haplogroup information from her DNA test and the name of her DNA test).

90.     Additionally, Plaintiff Nichols continued to periodically log into and use GEDmatch through 2024 to review her genetic information and see whether GEDmatch has reported any additional matches.

91.     Stated differently, Meta surreptitiously intercepted Plaintiff Nichols' Private Information as she used the GEDmatch website. Additionally, the information intercepted by Facebook via the Pixel included Plaintiff's Facebook ID, linking her communications with her Facebook profile.

92.     Defendant facilitated these compulsions and interceptions without Plaintiff Nichols' knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached its obligations under GIPA and under numerous statutory and common laws.

93.     Upon information and belief, Facebook also received Plaintiff Nichols' information directly through the Conversions API, which established a server-to-server data transmission from GEDmatch's website server.

94.     Plaintiff Nichols has a continuing interest in ensuring that future communications with GEDmatch are protected and safeguarded from future unauthorized compulsions and disclosures, and that Defendant ceases its practice of forcing the disclosure of Private Information from GEDmatch.

**H.     Plaintiff Robin Cook's Private Information Was Compelled by Defendant's Tools on the GEDmatch Website**

95.     In 2017, Plaintiff Cook uploaded her own DNA file to the GEDmatch website. In doing so, Plaintiff communicated information relating to her identity and her DNA results, including, crucially, the fact that she had been the subject of a genetic test—all of which consist of Private Information and is protected under GIPA and various statutory and common laws. Without her knowledge or permission, Defendant compelled the disclosure of this Private Information from GEDMatch and thus received the contents of those communications.

96.     Plaintiff Cook reasonably expected that her communications with GEDmatch via the website were confidential, solely between herself and GEDmatch, and that such communications would not be compelled and transmitted to or intercepted by any third party.

97.     Plaintiff Cook has an active Facebook account that she accesses through her phone and desktop computer. Plaintiff's Facebook account contains information that can personally identify her, including her name.

98.     Because the GEDmatch website utilizes the Facebook Pixel, the website's Source Code sent a secret set of instructions back to Plaintiff Cook's browser—which effectively acted as a wiretap—causing the Pixel to send Plaintiff Cook's FID, and the webpage's URL, and the contents of her communications to Defendant (including Private Information contained within those communications).

99.     Specifically, when Plaintiff Cook uploaded her DNA file to the GEDmatch website, and by operation of Facebook's agreement with GEDmatch and through the Pixel, Defendant compelled the disclosure of Plaintiff's communications with GEDmatch, including the fact that she uploaded her DNA file and her identity and, upon information and belief, her other interactions with the website, including how long she spent on particular web pages, which buttons she clicked on, which pages she viewed, and the text or phrases she typed into various portions of the website (such as, potentially, mitochondrial and Y haplogroup information from her DNA test and the name of her DNA test).

100.    Additionally, Plaintiff Cook continued to periodically log into and use GEDmatch through 2024 to review her genetic information and see whether GEDmatch has reported any additional matches.

101.    Stated differently, Meta surreptitiously intercepted Plaintiff Cook's Private Information as she used the GEDmatch website. Additionally, the information intercepted by Facebook via the Pixel included Plaintiff's Facebook ID, linking her communications with her Facebook profile.

102.    Defendant facilitated these compulsions and interceptions without Plaintiff Cook's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached its obligations under GIPA and under numerous statutory and common laws.

103.    Upon information and belief, Facebook also received Plaintiff Cook's information directly through the Conversions API, which established a server-to-server data transmission from GEDmatch's website server.

104.    Plaintiff Cook has a continuing interest in ensuring that future communications with GEDmatch are protected and safeguarded from future unauthorized compulsions and disclosures, and that Defendant ceases its practice of forcing the disclosure of Private Information from GEDmatch.

I.      **Plaintiff Lawrence Novida's Private Information Was Compelled by Defendant's Tools on the GEDmatch Website**

105.    In 2024, Plaintiff Novida uploaded his own DNA file to the GEDmatch website. In doing so, Plaintiff communicated information relating to his identity and his DNA results, including, crucially, the fact that he had been the subject of a genetic test—all of which consist of Private Information and is

protected under GIPA and various statutory and common laws. Without his knowledge or permission, Defendant compelled the disclosure of this Private Information from GEDMatch and thus received the contents of those communications.

106.   Plaintiff Novida reasonably expected that his communications with GEDmatch via the website were confidential, solely between himself and GEDmatch, and that such communications would not be compelled and transmitted to or intercepted by any third party.

107.   Plaintiff Novida has an active Facebook account that he accesses through his phone and desktop computer. Plaintiff's Facebook account contains information that can personally identify him, including his name.

108.   Because the GEDmatch website utilizes the Facebook Pixel, the website's Source Code sent a secret set of instructions back to Plaintiff Novida's browser—which effectively acted as a wiretap—causing the Pixel to send Plaintiff Novida's FID, and the webpage's URL, and the contents of his communications to Defendant (including Private Information contained within those communications).

109.   Specifically, when Plaintiff Novida uploaded his DNA file to the GEDmatch website, and by operation of Facebook's agreement with GEDmatch and through the Pixel, Defendant compelled the disclosure of Plaintiff's communications with GEDmatch, including the fact that he uploaded his DNA file and his identity and, upon information and belief, his other interactions with the website, including how long he spent on particular web pages, which buttons he clicked on, which pages he viewed, and the text or phrases he typed into various portions of the website (such as, potentially, mitochondrial and Y haplogroup information from his DNA test and the name of his DNA test).

110.   Additionally, Plaintiff Novida continued to periodically log into and use GEDmatch through 2024 to review his genetic information and see whether GEDmatch has reported any additional matches.

111.   Stated differently, Meta surreptitiously intercepted Plaintiff Novida's Private Information as he used the GEDmatch website. Additionally, the information intercepted by Facebook via the Pixel included Plaintiff's Facebook ID, linking his communications with his Facebook profile.

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

112.    Defendant facilitated these compulsions and interceptions without Plaintiff Novida's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached its obligations under GIPA and under numerous statutory and common laws.

113.    Upon information and belief, Facebook also received Plaintiff Novida's information directly through the Conversions API, which established a server-to-server data transmission from GEDmatch's website server.

114.    Plaintiff Novida has a continuing interest in ensuring that future communications with GEDmatch are protected and safeguarded from future unauthorized compulsions and disclosures, and that Defendant ceases its practice of forcing the disclosure of Private Information from GEDmatch.

115.    Thus, Defendant compelled the disclosure of the identities of thousands of Illinois consumers who had a genetic test performed, as well as, upon information and belief, information concerning the results of those tests, without their written consent, including that of Plaintiffs and the other Class members, in violation of GIPA and host of statutory and common laws.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

116.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

117.    Meta's software was secretly incorporated into GEDmatch's website, providing no indication to users that they were interacting with sites that shared their data, including Private Information, with third parties.

118.    Defendant and GEDmatch had exclusive knowledge that GEDmatch's website incorporated Meta's tracking technology, yet failed to disclose that fact to users, or that by interacting with GEDmatch's website, Plaintiffs' and Class members' sensitive data, including Private Information, would be intercepted by third parties.

119.    Plaintiffs were, at all times, diligent in using GEDmatch. Nevertheless, Plaintiffs and Class members could not with due diligence have discovered the full scope of Defendant's conduct, including because it is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that Meta was compelling its interception of data from GEDmatch's website.

120.   The earliest Plaintiffs and Class members could have known about Meta's conduct was shortly before the filing of this action through the investigation of counsel.

121.   Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

122.   Additionally, Meta concealed in its Privacy Policy that it collects Private Information from GEDmatch users, as well as *any* form of genetic information from *any* source. Instead, Meta maintains a Privacy Policy through which it purports to help users "understand what information we collect, and how we use and share it." Meta claims it is "important to [Meta] that [users] know how to control [their] privacy."[51]

123.   This was false. Meta does not disclose, in this purportedly comprehensive policy, that it will collect genetic information and Private Information from GEDmatch users. Quite the opposite, Meta represents in its Privacy Policy that it only collects "information when you visit [a] site or app" when its "partners … have the right to collect, use and share your information before giving it to us."[52] But as set forth below, Meta's receipt of Private Information—and GEDmatch's delivery of Private Information to Meta— was precluded by GIPA and statutory and common law, rendering its Privacy Policy false.

124.   Plaintiffs and Class Members were not aware that Defendant intercepted their data, including Private Data and genetic information.

125.   Plaintiffs and Class Members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Defendant's misconduct by virtue of its fraudulent concealment.

126.   Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

---

[51] *Privacy Policy*, META PLATFORMS, INC. (effective Jun. 24, 2024), https://www.facebook.com/privacy/policy (last visited Aug. 21, 2024).

[52] *Information from partners, vendors and other third parties*, META PLATFORMS, INC. (effective Jun. 24, 2024), https://www.facebook.com/privacy/?subpage=1.subpage.4-InformationFromPartnersVendors (last visited Aug. 21, 2024).

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**CLASS ACTION ALLEGATIONS**

127.    Plaintiffs bring this action on behalf of a Class and Subclasses of similarly situated individuals, pursuant to Federal Rule of Civil Procedure 23, defined as follows:

> **Nationwide Class:** All individuals residing in the United States who, during the applicable statute of limitations, (i) had a Facebook account; and (ii) whose Private Information was transmitted by the Facebook Pixel and other related technology from GEDmatch's website without their authorization.
>
> **Illinois Subclass:** All Illinois individuals who, during the applicable statute of limitations, (i) had a Facebook account; and (ii) whose Private Information was transmitted by the Facebook Pixel and other related technology without their authorization.
>
> **GEDmatch Subclass:** All Illinois individuals who, during the applicable statute of limitations, (i) had a Facebook account; and (ii) whose Private Information was transmitted by the Facebook Pixel and other related technology from GEDmatch's website without their authorization.

128.    Plaintiffs reserve the right to modify the class definitions or add sub-classes as necessary prior to filing a motion for class certification.

129.    Excluded from the Class and Subclasses are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

130.    Numerosity/Ascertainability. Members of the Class and Subclass are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class and Subclass members is unknown to Plaintiffs currently. However, it is estimated that there are at least thousands of individuals in the Class and Subclasses. The identity of such membership is readily ascertainable from Defendant's records and non-party records, including the records of GEDmatch.

131.    Typicality. Plaintiffs' claims are typical of the claims of the Class and Subclass because Plaintiffs used the GEDmatch website and had their Private Information intercepted by Defendant's Facebook Pixel and disclosed to third-party advertisers without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class and Subclass members.

132.   <u>Adequacy</u>. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class and Subclass members. Plaintiffs' interests are consistent with, and not antagonistic to, those of the Class and Subclass members.  Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class and Subclass members.

133.   <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest</u>. Questions of law and fact common to the Class and Subclass members predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and Subclasses. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  The following questions of law and fact are common to the Class and Subclasses:

(a)   Whether Defendant's conduct is subject to GIPA;

(b)   Whether Defendant violated Plaintiffs' and Class members' privacy rights;

(c)   Whether Defendant's acts and practices violated the Common Law Invasion of Privacy;

(d)   Whether Defendant was unjustly enriched;

(e)   Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code § § 630, *et seq*;

(f)   Whether Defendant surreptitiously acquired Plaintiffs' and the Class and Subclass members' Private Information;

(g)   Whether Defendant discloses Private Information to advertisers and/or other third parties;

(h)   Whether Defendant obtained written authorization from Plaintiffs and the other Class and Subclass members before disclosing their Private Information;

(i)   Whether Defendant's violations of GIPA were willful or reckless;

(j)   Whether Defendant's violations of GIPA were negligent;

(k)     Whether Plaintiffs and the Class and Subclass members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary and injunctive relief; and

(l)     Whether Plaintiffs and Class members and Subclass members are entitled equitable relief, including, but not limited to, injunctive relief, restitution, and disgorgement.

134.    <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiffs are unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

<strong>CLAIMS FOR RELIEF</strong>

<strong><u>FIRST CLAIM FOR RELIEF</u></strong>
<strong>Violation of the Illinois Genetic Information Privacy Act, 410 ILCS 513/1, <em>et seq.</em></strong>
<strong>(On behalf of Plaintiffs and the Illinois and GEDmatch Subclasses)</strong>

135.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the proposed Subclasses.

136.    Defendant Meta Platforms, Inc. is a corporation and, therefore, a "person" under 410 ILCS 513/10.

137.    The information that Defendant obtained from Plaintiffs and Subclasses includes the type of information protected by GIPA. 410 ILCS 513/10.

138.    GIPA states that no person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test. <em>See</em> 410 ILCS 513/30(a).

139.    Plaintiffs and the members of the Subclasses are individuals who uploaded their DNA data to GEDmatch.

140.     Defendant Meta, through the use of its Facebook Pixel and CAPI, then obtained Plaintiffs' and Subclass members' Private Information which consists of the fact that they uploaded their genetic information and had a genetic test performed, their identities, and, upon information and belief, information about the results of their genetic test, including their mitochondrial and Y haplogroup information.

141.     Crucially, this information was compelled by Defendant Meta when it entered into contracts with its customers (i.e. GEDMatch) to permit the disclosure of all web traffic and all user information, including the disclosure of all actions taken on their customers' website, for Defendant's analytics and advertising business.

142.     In other words, Defendant compelled the disclosure of Plaintiffs' and the other Subclass members' identities who had been the subject of genetic tests and results of their genetic tests. *See* 410 ILCS 513/30(a).

143.     Defendant failed to obtain written authorization from Plaintiffs or the members of the Subclasses to obtain their Private Information, as required by 410 ILCS 513/30(a) and 410 ILCS 513/35.

144.     Plaintiffs and the other Class members have been aggrieved by Defendant's violations of their statutorily protected rights to privacy in their genetic information as set forth in GIPA when Defendant compelled the disclosure of their identities and other genetic information without their consent.

145.     Defendant's violations of GIPA, as set forth herein, were knowing and willful, or were at least in reckless disregard of the statutory requirements. Alternatively, Defendant negligently failed to comply with GIPA.

146.     On behalf of themselves and the Subclasses, Plaintiffs seek: (1) a declaration that Defendant's actions violate GIPA, 410 ILCS 513/1, *et seq*.; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Subclasses by requiring Defendant to comply with GIPA's requirements; (2) statutory damages of $15,000 for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(a)(2) or, in the alternative, statutory damages of $2,500 for each

negligent violation of GIPA pursuant to 410 ILCS 513/40(a)(1); and (3) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(a)(3).

**SECOND CLAIM FOR RELIEF**
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On behalf of Plaintiffs and the Nationwide Class)**

147.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the Nationwide Class.

148.     Plaintiffs asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs have a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

149.     Defendant's surreptitious interception, storage, and use of Plaintiffs' and Class members interactions and communications with GEDmatch, including their provision of Private Information to GEDmatch, constitutes an intentional intrusion upon Plaintiffs' and Class members' solitude or seclusion.

150.     Plaintiffs and Class members expected this information to remain private and confidential given the nature of the Private Information, which includes information based on the results of their genetic testing, the fact that they were the subjects of genetic tests, their identities, and other private interactions with the GEDmatch website.

151.     Plaintiffs and Class members did not consent to, authorize, or know about Defendant's intrusion at time it occurred. Plaintiffs and Class members never agreed that Defendant could intercept, store, and use this data.

152.     Defendant's intentional intrusion on Plaintiffs' and Class members' solitude or seclusion would be highly offensive to a reasonable person. Plaintiffs and Class members reasonably expected that their information would not be collected by Defendant, which was not a party to any of their communications with GEDmatch.

153.     The surreptitious taking and interception of sensitive data, including Private Data and genetic information, from thousands, if not millions, of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies

show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

154.   The offensiveness of this conduct is all the more apparent because Defendant's interception, storage, and use of this information was conducted inconspicuously in a manner that Plaintiffs and Class members would be unable to detect and was contrary to the actual representations made by it.

155.   Given the highly sensitive nature of the data that Defendant intercepted, such as private details about genetic information, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

156.   As a result of Defendant's actions, Plaintiffs and Class members have suffered harm and injury, including, but not limited to, an invasion of their privacy rights.

157.   Plaintiffs and Class members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

158.   Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

159.   Plaintiffs and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

160.   Plaintiffs also seek such other relief as the Court may deem just and proper.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (On behalf of Plaintiffs and the Nationwide Class)

161.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the Nationwide Class.

162.    Defendant received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

163.    Defendant received benefits from Plaintiffs and Class members in the form of the Plaintiffs' and Class members' highly valuable data, including Private Information and genetic data, that Defendant wrongfully intercepted from Plaintiffs and Class members without authorization and proper compensation.

164.    Defendant intercepted, stored, and used this data for its own gain, providing Defendant with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

165.    Had Plaintiffs known of Defendant's misconduct, they would not have provided any of their data to Defendant or used GEDmatch's services.

166.    Defendant unjustly retained these benefits at the expense of Plaintiffs and Class members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

167.    The benefits that Defendant derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California and every other state for Defendant to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Amended Complaint.

168.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**(On behalf of Plaintiffs and the Nationwide Class)**

169.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the Nationwide Class.

170.     The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

171.     Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

172.     Defendant is a person for purposes of § 631.

173.     Defendant maintains its principal places of business in California, where it designed, contrived, agreed, conspired, effectuated, and/or received the interception and use of the contents of Plaintiffs' and Class members' communications. Additionally, Meta has adopted California substantive law to govern their relationship with users, including Plaintiffs.

174.     Defendant's Pixel and other tracking technologies, Plaintiffs' and Class members' browsers and mobile applications, and Plaintiffs' and Class members' computing and mobile devices are a "machine, instrument, contrivance, or . . . other manner."

175.     At all relevant times, Meta, using its Meta Pixel and other tracking technologies, intentionally tapped or made unauthorized connections with, the lines of internet communication

between Plaintiffs and Class members and the GEDmatch website without the consent of all parties to the communication.

176.   Defendant, willfully and without the consent of Plaintiffs and Class members, reads or attempt to reads, or learn the contents or meaning of Plaintiffs' and Class members' communications to GEDmatch while the communications are in transit or passing over any wire, line or cable, or were being received at any place within California when it intercepted Plaintiffs' and Class members' communications and data with GEDmatch, which maintains its principle place of business in San Diego, California, in real time.

177.   Defendant used or attempted to use the communications and information it received through its Pixel and other tracking technologies, including to supply analytics and advertising services.

178.   The interception of Plaintiffs' and Class members' communications was without authorization and consent from the Plaintiffs and Class members. Accordingly, the interception was unlawful and tortious.

179.   Plaintiffs and the Class members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

180.   Plaintiffs and Class members have also suffered irreparable injury from these unauthorized acts. Plaintiffs' and Class members' sensitive data has been collected, viewed, accessed, and stored by Defendant, has not been destroyed, and due to the continuing threat of such injury, Plaintiffs and Class members have no adequate remedy at law, Plaintiffs and Class members are entitled to injunctive relief.

**FIFTH CLAIM FOR RELIEF**
**Violation of CIPA**
**Cal. Penal Code § 632**
**(On behalf of Plaintiffs and the Nationwide Class)**

181.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the Nationwide Class.

182.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication[.]"

183.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

184.    Plaintiffs' and Class members' communications to GEDmatch, including their Private Information and genetic data, were confidential communications for purposes of § 632, including because Plaintiffs and Class members had an objectively reasonable expectation of privacy in this data.

185.    Plaintiffs and Class members expected their communications to GEDmatch to be confined to GEDmatch, in part because of GEDmatch's consistent representations that these communications would remain confidential. Plaintiffs and Class members did not expect third parties, and specifically Defendant, to secretly eavesdrop upon or record this information and their communications.

186.    The Meta Pixel and Defendant's other tracking technologies are electronic amplifying or recording devices for purposes of § 632.

187.    By contemporaneously intercepting and recording Plaintiffs' and Class members' confidential communications to GEDmatch through the Meta Pixel and other recording technologies, Defendant eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

188.    At no time did Plaintiffs or Class members consent to Defendant's conduct, nor could they reasonably expect that their communications to GEDmatch would be overheard or recorded by Defendant.

189.    Defendant utilized Plaintiffs' and Class members' sensitive genetic information for its own purposes, including advertising and analytics.

190.    Plaintiffs and Class members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages

sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

191.    Plaintiffs and Class members have also suffered irreparable injury from these unauthorized acts. Plaintiffs' and Class members' sensitive data has been collected, viewed, accessed, and stored by Defendant, has not been destroyed, and due to the continuing threat of such injury, Plaintiffs and Class members have no adequate remedy at law, Plaintiffs and Class members are entitled to injunctive relief.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On behalf of Plaintiffs and the Nationwide Class)**

192.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the Nationwide Class.

193.    California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

194.    Defendant engaged in unlawful business practices in connection with its forced interception of Plaintiffs' and Class Members' Private Information to GEDmatch, in violation of the UCL.

195.    The acts, omissions, and conduct of Defendant as alleged therein constitute "business practices" within the meaning of the UCL.

196.    Defendant violated the "unlawful" prong of the UCL by violating, *inter alia,* Plaintiffs' and Class Members' rights to privacy, state and federal privacy statutes, and state consumer protection statutes.

197.    Defendant's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct, as alleged therein, offended public policy (including the federal and state privacy statutes and state consumer protection statutes, such as CIPA) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and Class Members.

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

198.    The harm caused by Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described therein.

199.    As a result of Defendant's violations of the UCL, Plaintiffs and Class Members are entitled to injunctive relief. This is particularly true since the dissemination of Plaintiffs' and Class Members' information is ongoing.

200.    As result of Defendant's violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to access to their private and personal data. Plaintiffs and Class Members would not have used Defendant's services, or would have paid less for them, had they known Defendant was breaching confidentiality and intercepting their Private Information for its own advertising purposes and profits.

201.    The unauthorized access to Plaintiffs' and Class Members' private and personal data also has diminished the value of that information.

202.    In the alternative to those claims seeking remedies at law, Plaintiffs and Class Members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendant's unlawful and unfair business practices. Therefore, Plaintiffs and members of the proposed Class are entitled to equitable relief to restore Plaintiffs and Class Members to position they would have been in had Defendant not engaged in unfair competition, including an order enjoining Defendant's wrongful conduct, restitution, and disgorgement of all profits paid to Defendant as a result of its unlawful and unfair practices.

**SEVENTH CLAIM FOR RELIEF**
**Invasion of Privacy Under California's Constitution**
**(On behalf of Plaintiffs and the Nationwide Class)**

203.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the Nationwide Class.

204.    Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and Private Information, including genetic data; and (2) making personal decisions and/or conducting personal activities without observation, intrusion

or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to interceptions without Plaintiffs' and Class Members' knowledge or consent.

205.    At all relevant times, by using Facebook's Tracking Pixel and other tracking technologies to communicate Private Information alongside, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

206.    Plaintiffs and Class Members had a reasonable expectation that their communications, identity, Private Information, including genetic data, and other data would remain confidential, and that Defendant would not interception these communications and information on GEDmatch's website.

207.    Plaintiffs and Class Members did not authorize Defendant to transmit their Private Information to Facebook or to allow Facebook to intercept, receive, and view those communications.

208.    This invasion of privacy is serious in nature, scope, and impact, in part, because it relates to sensitive genetic data. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

209.    As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

210.    Plaintiffs and Class Members have been damaged as a direct and proximate result Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

211.    Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests because of its intrusion upon Plaintiffs' and Class Members' privacy.

212.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

213.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**EIGHTH CLAIM FOR RELIEF**
**Breach of Contract**
**(On behalf of Plaintiffs and the Nationwide Class)**
**(In the alternative to the Third Claim For Relief)**

214.    Plaintiffs repeat the allegations contained in paragraphs 1–160 and 169–213 above as if fully set forth herein and bring this count individually and on behalf of the Nationwide Class, in the alternative to the Third Claim for Relief.

215.    Meta requires Facebook users like Plaintiffs and Class members to click a box indicating that by clicking Sign Up, they agree to its Terms of Service and Privacy Policy.

216.    Meta's services to Plaintiffs and Class members are not free. In exchange for access to Meta and its services, Plaintiffs and Class members agree to provide Meta with a limited set of personal information and the ability to show the Plaintiffs advertisements based on the contractually bargained-for limited set of personal information that the parties agree can be acquired and used by Meta.

217.    The "personal information" that Plaintiffs and Class members must pay for access to Meta's services is not unlimited but instead is bound by the promises made by Meta in the documents that make up the Meta contract with its users.

218.    For example, by signing up for Meta, it is undisputed that Plaintiffs have not agreed to pay for the service by permitting Meta to collect their Social Security number. Nor have Plaintiffs or class members agreed to pay for Meta's services with their Private Information.

219.    The "data license" that Meta promised it would charge for use of Meta's products did not include genetic data and expressly excluded any information that Meta's Partners did not have the right to share with Meta.

220.    For example, Meta makes the following contractual promise to Plaintiffs and Class members: "How do we collect or receive this information from partners? Partners use our Business Tools, integrations and Meta Audience Network technologies to share information with us. These partners collect your information when you visit their site or app or use their services, or through other businesses or organizations they work with. ***We require partners to have the right to collect, use and share your information before giving it to us.***" (emphases added).

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

221.   Prior versions of Meta's privacy policies contained substantively identical commitments that partners are required to have the right to collect, use, and share information provided to Meta.

222.   Meta breached its promises by not requiring GEDmatch to actually have the right to share Plaintiffs' and Class members' Private Information, including their genetic data, alleged herein.

223.   Meta materially breached its contract with its users by failing to require that GEDmatch gain the necessary authorizations before sharing any genetic data of Illinois residents, as expressly required by GIPA. *See* 410 ILCS 513/30(a)(2). Likewise, Meta materially breached its contract with its users by failing to require that GEDmatch submit records of the necessary user authorizations to Facebook before sharing any genetic data with Facebook.

224.   Meta took no action to require GEDmatch to not send Plaintiffs' and Class members' Private Information, including genetic information, without consent.

225.   Meta did not implement any technological blocks to prevent Meta's acquisition of Private Information, including genetic information, without authorization.

226.   Meta did not implement any monitoring system to prevent Meta's acquisition of Private Information, including genetic information, without authorization.

227.   Instead of requiring its advertising partners to have the right to share genetic data before doing so, Meta actively encouraged and solicited them to share genetic data without regard or concern to whether they had the right to share such information.

228.   In breaching its promise, Meta overcharged Plaintiffs and Class members by collecting data in excess of the "data license" that was agreed upon in the contract between Meta and its users. Specifically, Meta expressly promised that its "data license" would not include information that its advertising partners do not have the right to share with Meta, but Meta charged the additional data license anyway.

229.   As a direct and proximate result of Meta's breach of contract, Plaintiffs and Class members did not receive the full benefit of the bargain, and instead received services from Meta that were less valuable than described in their contract with Meta. Plaintiffs and Class members, therefore, were damaged in an amount at least equal to the difference in value between that which was promised and Facebook's partial, deficient, and/or defective performance.

230.    Meta's breach caused Plaintiffs and Class members the following damages:

(a)    Nominal damages;

(b)    The interruption or preclusion of Plaintiffs' and Class members' ability to utilize GEDmatch's website;

(c)    The diminution in value of Plaintiffs' and Class members' Protected Information;

(d)    The loss of privacy due to Meta making sensitive and confidential information including genetic data that Plaintiffs intended to remain private no longer private;

(e)    Meta took something of value from Plaintiffs and Class members and derived benefits therefrom without Plaintiffs' and Class members' knowledge or informed consent and without sharing the benefit of such value;

(f)    The deprivation of the benefit of the bargain in that Meta's contract stated that the data license for its services did not include Private Information from partners who did not have the right to share information with Meta, but Meta actually took more data than the contractually agreed-upon amount;

(g)    The amount that Meta should have spent implementing controls to ensure that genetic data was not provided to Meta without the patients' consent; and

(h)    Plaintiffs and Class Members suffered an invasion of privacy. Plaintiffs and Class Members seek compensatory damages for the invasion of their privacy.

231.    For Meta's breaches, Plaintiffs and Class members seek nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, restitution, and any other relief the Court deems just.

## RELIEF REQUESTED

Plaintiffs, on behalf of themselves and the proposed Class and Subclasses, respectfully request that the Court enter an Order:

(a)    Certifying the Nationwide Class and the Illinois and GEDMatch Subclasses and appointing Plaintiffs and Plaintiffs' counsel to represent the Class and Subclasses;

(b)    Declaring Defendant's past conduct was unlawful, as alleged herein;

(c)     Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

(d)     Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

(e)     Awarding Plaintiffs and members of the Classes statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

(f)     Declaring that Defendant's actions violate GIPA, 410 ILCS 513/1, *et seq.*;

(g)     Awarding Plaintiff and the Class statutory damages of $15,000.00 for each and every intentional and /or reckless violation of GIPA pursuant to 410 ILCS 513(40)(a)(2), or alternatively, statutory damages of $2,500 for each and every violation pursuant to 410 ILCS 513(40)(a)(1) if the Court finds that Defendant's violations were negligent;

(h)     Awarding injunctive and other equitable relief as is necessary pursuant to 410 ILCS 513(40)(a)(4) to protect the interests of the Class;

(i)     Awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and costs of other litigation expenses, pursuant to 410 ILCS 513/40(a)(3);

(j)     Awarding Plaintiffs and the Class and Subclasses pre- and post-judgment interest, to the extent allowable; and

(k)     Awarding such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Class and Subclasses, demand a trial by jury for all the claims asserted in this Amended Complaint so triable.

Dated: August 21, 2024                    **LYNCH CARPENTER, LLP**

By:     */s/ Todd D. Carpenter*
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Tel:     (619) 762-1900
Fax:     (818) 313-1850

**LYNCH CARPENTER, LLP**
Katrina Carroll (*pro hac vice* forthcoming)
katrina@lcllp.com
Kyle Shamberg (*pro hac vice* forthcoming)
kyle@lcllp.com
111 W. Washington St., Ste. 1240
Chicago, IL 60602
Tel.:   (312) 750-1265

**MCGUIRE LAW, P.C.**
David L. Gerbie (*pro hac vice* forthcoming)
dgerbie@mcgpc.com
Andrew T. Heldut (*pro hac vice* forthcoming)
aheldut@mcgpc.com
Joseph Dunklin (pro hac vice forthcoming)
jdunklin@mcgpc.com
55 W. Wacker Drive, 9th Floor
Chicago, IL 606061
Tel.:    (312) 893-7002

**FREED KANNER LONDON**
**& MILLEN LLC**
Jonathan M. Jagher (*pro hac vice*)
jjagher@fklmlaw.com
923 Fayette Street
Conshohocken, PA 19428
Tel.:    (610) 234-6486

**FREED KANNER LONDON**
**& MILLEN LLC**
Nichols R. Lange (*pro hac vice* forthcoming)
nlange@fklmlaw.com
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Tel.:    (224) 632-4510

*Attorneys for Plaintiffs and the Putative Class and*
*Subclasses*

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL