**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

**COOLEY LLP**
MICHAEL G. RHODES, SBN 116127
rhodesmg@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

*Attorneys for Defendant Meta Platforms, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

PHYLLIS NICHOLS, ROBIN COOK, and LAWRENCE NOVIDA, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 4:24-cv-02914-JSW

**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

Date: January 17, 2025
Time: 9:00 a.m.
Videoconference

Action Filed: April 9, 2024
Honorable Jeffrey S. White

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 17, 2025, at 9:00 a.m., before the Honorable Jeffrey S. White of the United States District Court for the Northern District of California, via videoconference, Defendant Meta Platforms, Inc., will, and hereby does, move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing the amended complaint with prejudice.

The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the proposed order filed concurrently herewith; the request for judicial notice and accompanying declaration; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

## STATEMENT OF ISSUES TO BE DECIDED

Should the amended complaint be dismissed under Rule 12(b)(6) for failure to state a claim?

## TABLE OF CONTENTS

Page


INTRODUCTION ........ 1

BACKGROUND ........ 3

- A. Meta's Pixel ........ 3
- B. Meta's Policies ........ 4
- C. Plaintiffs' Allegations ........ 6

LEGAL STANDARD ........ 7

ARGUMENT ........ 7

- I. Plaintiffs Consented To Meta's Receipt Of Their Data. ........ 7
- II. Plaintiffs' Vague Allegations Fail To Show What, If Any, Sensitive Information GEDmatch Sent To Meta About Them. ........ 10
- III. Plaintiffs Fail To Allege Meta Intended For GEDmatch To Send Sensitive Information. ........ 11
- IV. Plaintiffs' Claims Fail For Numerous Other Reasons. ........ 14
  - A. Plaintiffs Fail To State A GIPA Claim (Count 1). ........ 14
  - B. Plaintiffs Fail To State A CIPA Claim (Counts 4 And 5). ........ 17
  - C. Plaintiffs Fail To State A Constitutional Privacy (Count 7) Or Intrusion Upon Seclusion (Count 2) Claim. ........ 20
  - D. Plaintiffs Fail To State A UCL Claim (Count 6). ........ 21
  - E. Plaintiffs Fail To State An Unjust Enrichment Claim (Count 3). ........ 23
  - F. Plaintiffs Fail To State A Breach Of Contract Claim (Count 8). ........ 24

CONCLUSION ........ 25


Gibson, Dunn & Crutcher LLP

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Alatortev v. JetBlue Airways Corp.*,
2018 WL 2735355 (N.D. Cal. June 7, 2018) ....................24

*In re Apple Processor Litig.*,
2023 WL 5950622 (9th Cir. Sept. 13, 2023)....................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................7, 18

*Bass v. Facebook, Inc.*,
394 F. Supp. 3d 1024 (N.D. Cal. 2019) ....................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................7, 18

*Belluomini v. Citigroup, Inc.*,
2013 WL 3855589 (N.D. Cal. July 24, 2013)....................20

*Belluomini v. Citigroup Inc.*,
2013 WL 5645168 (N.D. Cal. Oct. 16, 2013)....................20

*Bridges v. Blackstone Grp., Inc.*,
2022 WL 2643968 (S.D. Ill. July 8, 2022)....................15

*Bridges v. Blackstone, Inc.*,
66 F.4th 687 (7th Cir. 2023)....................15

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ....................17

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ....................22

*Curley v. Verogen, Inc.*,
No. 2024CH08282 (Cook Cnty. Cir. Ct. Aug. 30, 2024) ....................15

*Dinosaur Dev., Inc. v. White*,
216 Cal. App. 3d 1310 (1989)....................23

*Doe I v. Google LLC*,
2024 WL 3490744 (N.D. Cal. July 22, 2024)....................2, 3, 9, 10, 11, 12, 13, 21, 22, 23

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ....................13, 21, 22, 25

*F.B.T. Prods., LLC v. Aftermath Records*,
621 F.3d 958 (9th Cir. 2010)....................8

*In re Facebook Biometric Info. Priv. Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016) ....................17

*In re Facebook Priv. Litig.*,
791 F. Supp. 2d 705 (N.D. Cal. 2011) ....................24

*In re Facebook, Inc. Sec. Litig.*,
477 F. Supp. 3d 980 (N.D. Cal. 2020) ....................9, 25

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) ....................19, 20

*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*,
209 Cal. App. 4th 1118 (2012)....................24

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
771 F.3d 1119 (9th Cir. 2014)....................22

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024) ....................8

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ....................20

*Hart v. TWC Prod. & Tech. LLC*,
526 F. Supp. 3d 592 (N.D. Cal. 2021) ....................22

*Haskins v. Symantec Corp.*,
654 F. App'x 338 (9th Cir. 2016) ....................23

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ....................11, 20, 21

*Herskowitz v. Apple Inc.*,
940 F. Supp. 2d 1131 (N.D. Cal. 2013) ....................23

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024)....................20, 21

*Int'l Star Registry of Ill. v. ABC Radio Network, Inc.*,
451 F. Supp. 2d 982 (N.D. Ill. 2006) ....................22

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................21

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ....................21

*Kellman v. Spokeo, Inc.*,
599 F. Supp. 3d 877 (N.D. Cal. 2022) ....................22

*Lebrun v. CBS Television Studios, Inc.*,
68 Cal. App. 5th 199 (2021)....................23

*Lloyd v. Facebook, Inc.*,
2024 WL 3325389 (9th Cir. July 8, 2024) ........................................ 8

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021) ........................................ 13, 18

*Los Angeles Police Protective League v. City of Los Angeles*,
35 Cal. App. 4th 1535 (1995) ........................................ 15

*M.G. v. Therapymatch, Inc.*,
2024 WL 4219992 (N.D. Cal. Sept. 16, 2024) ........................................ 19

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ........................................ 8, 9

*In re Meta Pixel Tax Filing Cases*,
2024 WL 1251350 (N.D. Cal. Mar. 25, 2024) ........................................ 8, 9, 13, 22

*Moore v. Centrelake Med. Grp., Inc.*,
83 Cal. App. 5th 515 (2022) ........................................ 22

*Moreno v. San Francisco Bay Area Rapid Transit*,
2017 WL 6387764 (N.D. Cal. Dec. 14, 2017) ........................................ 18

*In re Nexus 6P Prod. Liab. Litig.*,
293 F. Supp. 3d 888 (N.D. Cal. 2018) ........................................ 16

*Opperman v. Path, Inc.*,
205 F. Supp. 3d 1064 (N.D. Cal. 2016) ........................................ 7

*Pac. W. Grp., Inc. v. Real Time Solutions, Inc.*,
321 F. App'x 566 (9th Cir. 2008) ........................................ 24

*Palomino v. Facebook, Inc.*,
2017 WL 76901 (N.D. Cal. Jan. 9, 2017) ........................................ 16, 17

*People v. Braden*,
14 Cal. 5th 791 (2023) ........................................ 18

*People v. Drennan*,
84 Cal. App. 4th 1349 (2000) ........................................ 19

*People v. Nakai*,
183 Cal. App. 4th 499 (2010) ........................................ 19, 20

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1190 (N.D. Cal. 2014) ........................................ 8, 23

*Pruchnicki v. Envision Healthcare Corp.*,
845 F. App'x 613 (9th Cir. 2021) ........................................ 21

*Razuki v. Caliber Home Loans, Inc.*,
2018 WL 2761818 (S.D. Cal. June 8, 2018) ........................................ 21

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019)......19

*Rodriguez v. Google LLC*,
2021 WL 2026726 (N.D. Cal. May 21, 2021)......19

*Rutherford Holdings, LLC v. Plaza Del Rey*,
223 Cal. App. 4th 221 (2014)......24

*Seismic Reservoir 2020, Inc. v. Paulsson*,
785 F.3d 330 (9th Cir. 2015)......7

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021)......8

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017)......19, 20

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018)......7

*State v. Hartman*,
27 Wash. App. 2d 952 (2023)......11

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015)......12

*Vartanian v. VW Credit, Inc.*,
2012 WL 12326334 (C.D. Cal. Feb. 22, 2012)......12

*Wash. Mut. Bank, FA v. Superior Ct.*,
24 Cal. 4th 906 (2001)......16

*Williams v. Facebook, Inc.*,
384 F. Supp. 3d 1043 (N.D. Cal. 2018)......16, 17

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014)......17

**Statutes**

410 ILCS 513/15(a)......14

410 ILCS 513/30(a)......14

410 ILCS 513/30(b)......14

Cal. Bus. & Prof. Code § 17200......12

Cal. Bus. & Prof. Code § 17204......21

Cal. Civ. Code § 56.181......16

Cal. Civ. Code § 3515......7

Cal. Penal Code § 631(a) ....................7, 11, 17

Cal. Penal Code § 632(a) ....................7, 11, 17, 18, 19

**Other Authorities**

Compel, *Black's Law Dictionary* (11th ed. 2019) ....................15

Compel, *Merriam-Webster's Dictionary of Law* (2d ed. 2016) ....................15

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs' amended complaint is entirely misdirected: Plaintiffs have sued Meta for the alleged wrongdoing of an entirely different company, GEDmatch. The crux of plaintiffs' grievance is that GEDmatch improperly shared sensitive information about plaintiffs with Meta without sufficiently notifying them or obtaining adequate consent first. But plaintiffs' allegations about *GEDmatch's* alleged wrongdoing fail to state a claim against Meta—especially given that Meta's Business Tools Terms, to which GEDmatch agreed, prohibited GEDmatch from sharing this information with Meta without proper consent.

Like numerous other companies, Meta offers a pixel (the "Meta Pixel")—a ubiquitous and helpful internet tool—that it makes available to web developers for free, subject to Meta's Business Tools Terms. Web developers, not Meta, choose whether to use this tool, where to place it on their websites, and how to configure it, including choosing what information is tracked and shared with Meta. Meta's Business Tools Terms require websites, including GEDmatch, to provide proper notice regarding the use of the Meta Pixel and to represent and warrant that they have all rights and a lawful basis to disclose the data collected by the Meta Pixel. The same Business Tools Terms also forbid websites from sharing any sensitive information with Meta. And Meta's Privacy Policy discloses to Meta users (such as plaintiffs) that third-party websites can use the Meta Pixel, and that when they do, the information collected is shared with Meta. Notably, that same policy reaffirms that Meta requires web developers to have a right to share a user's information before giving it to Meta.

Meta cannot be held liable for the alleged wrongdoing of a third-party developer who allegedly used the Meta Pixel improperly. In an attempt to avoid this result, plaintiffs try to manufacture liability by rewriting Meta's Privacy Policy to say that Meta represents that it only receives information from the Meta Pixel when its partners have the right to share that information. That is not what Meta's Privacy Policy says. Meta's Privacy Policy says that it requires its partners to have the right to share information. That is precisely what Meta does through the contractual obligations it places on any developer using its Pixel. Through the Business Tools Terms, Meta requires web developers, including GEDmatch, to "represent and warrant that you . . . have all of the necessary rights and permissions and

a lawful basis . . . for the disclosure and use of Business Tool Data." Meta's Request for Judicial Notice ("RJN") Ex. 3 at 2. The Business Tools Terms further forbid developers from sharing any "sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." *Id.*

But Meta's Privacy Policy does *not* say that Meta will never receive information from partners that do not have the right to share that information. Meta is transparent about this in its Terms with Facebook users, including plaintiffs. Meta informs users generally in its Terms that it "use[s] your personal data to help determine which personalized ads to show you," and more specifically in its Privacy Policy that it "collect[s] and receive[s] information" from third parties "about a variety of your information and activities"—including "[h]ow you use [third parties'] products and services, online or in person," and including through the use of the Meta Pixel. RJN Exs. 1, 2. Meta's Terms also expressly warn that Meta does "not control or direct what . . . others do," is "not responsible for their actions or conduct," and "cannot predict when issues might arise with [Meta's] Products," including the Meta Pixel. RJN Ex. 1 at 8. In exchange for using Facebook for free, Facebook users—including plaintiffs—accept these terms and agree that Meta's "liability shall be limited to the fullest extent permitted by applicable law." *Id.* Plaintiffs' consent precludes Meta's liability and all of plaintiffs' claims must be dismissed.

Plaintiffs' claims fail across the board for additional reasons. *First*, all of plaintiffs' claims are premised on Meta receiving *sensitive* information, but plaintiffs' allegations are too vague in that regard. *See Doe I v. Google LLC*, 2024 WL 3490744 (N.D. Cal. July 22, 2024) ("*Google Pixel*") (dismissing complaint where plaintiffs' generic allegations that a given healthcare provider's "web property" used Google's pixel were "too vague to support an inference that the providers ha[d], contrary to [Google's] admonition, caused Google to receive the plaintiffs' personal health information").

*Second*, plaintiffs do not plausibly allege that Meta *intended* to receive any sensitive information. Plaintiffs admit that pixels "are bits of code that *web developers*"—not Meta—"can integrate into their webpages," and that they—not Meta—"*choose* which types of content are tracked." Dkt. 26, Amended Class Action Complaint ("Compl.") ¶¶ 63–65 (emphases added). Plaintiffs do not allege, nor could they, that Meta took any action with respect to placing or configuring the Meta Pixel on

GEDmatch's site, much less with any particular intent. Indeed, Meta's Business Tools Terms *forbid* websites from sharing sensitive information with Meta, demonstrating that Meta "purposefully acted so as *not* to receive any [sensitive] information." *Google Pixel*, 2024 WL 3490744, at *4.

In addition to all of these cross-cutting issues, each of plaintiffs' causes of action fails for a host of claim-specific reasons described in detail below.

For all of the reasons set forth below, this Court should dismiss the complaint in full.

## BACKGROUND

### A. Meta's Pixel

This case centers on GEDmatch's alleged use of a common analytics tool offered by numerous companies and used across industries called a "pixel." Meta's version of this tool, the Meta Pixel, is a free, publicly available piece of source code that web developers (like GEDmatch) "can integrate into their webpages." Compl. ¶ 63.[1] The Meta Pixel helps web developers analyze activity on their websites by allowing them to measure certain "events," *i.e.*, "information that [web developers] share about people and the actions that they take on [their] websites and apps." RJN Ex. 3 at 1; *see also* Compl. ¶¶ 63–65. When a user engages in activities the developer has chosen to measure, the developer shares the occurrence of those events with Meta through a transmission to Meta's servers of the data that the web developer configured the Pixel to collect. Compl. ¶¶ 66–68. Using cookies and other information sent along with the events, Meta "may correlate Event Data to people who use Meta Products to . . . determine the relevance of ads to people," including using "Event Data to personalize the features and content (including ads and recommendations) that [Meta] show[s] people on and off [its] Meta Products." RJN Ex. 3 at 3. For example, a clothing website may wish to show ads to someone who placed an item in their online cart but did not complete the purchase. Web developers choose whether, where, and how to use this technology, including what information they want to send. Compl. ¶¶ 62–65.

This technology is ubiquitous across the web and is a staple of the modern internet: Plaintiffs allege the Meta Pixel alone is used "on thousands of websites," Compl. ¶ 11, and numerous other

[1] Plaintiffs also refer to another tool—the Conversions API, or "CAPI"—but the complaint focuses on the Meta Pixel and does not allege any facts about CAPI that would change the analysis for purposes of this motion to dismiss. *See* Compl. ¶¶ 15–20, 24, 49, 63, 140.

companies (like Google) offer their own versions of this common tool. By facilitating these analytics services, pixel technology helps web developers understand and measure how people use their products and services, better reach individuals who might be interested, and improve users' online experience.

### B. Meta's Policies

When Facebook users—including plaintiffs, who all allege that they "ha[ve] an active Facebook account," Compl. ¶¶ 87, 97, 107—sign up for Facebook, they "agree to [Meta's] Terms of Service and Privacy Policy." *Id.* ¶ 215; *see* RJN Exs. 1, 2. Similarly, web developers must agree to Meta's Business Tools Terms in order to use the Meta Pixel. *See* Compl. ¶¶ 20, 71, 141; RJN Ex. 3. These policies for Facebook users and third-party web developers, respectively, provide important disclosures and limitations on the use of Meta's products: as relevant here, they tell users that Meta receives data from third-party websites about users' activity on those websites, and they forbid web developers from using the Meta Business Tools (including the Meta Pixel) to send any sensitive or statutorily protected information to Meta.[2]

***Terms of Service.*** Meta's Terms of Service "govern [the] use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software" Meta offers. RJN Ex. 1 at 1. The Terms explain:

> We don't charge you to use Facebook or the other products and services covered by these Terms, unless we state otherwise. Instead, businesses and organizations, and other persons pay us to show you ads for their products and services. By using our Products, you agree that we can show you ads that we think may be relevant to you and your interests. We use your personal data to help determine which personalized ads to show you.

*Id.* The Terms link to the Privacy Policy to "explain[] how we collect and use your personal data to determine some of the ads you see." *Id.* Facebook users also agree that any claim, cause of action, or dispute arising out of or relating to those Terms or to their use of Meta's Products (defined to include the Meta Pixel) "shall be resolved exclusively" in state or federal California courts, and "that the laws of the State of California will govern these Terms and any claim, cause of action, or dispute without

---

[2] This motion quotes the version of each policy that was in effect at the time plaintiffs filed their initial complaint. Meta's Request for Judicial Notice includes publicly available versions of each policy dating back four years from the filing of the complaint (the longest applicable statute of limitations for plaintiffs' claims) through the present.

regard to conflict of law provisions." *Id.* at 8. Meta's Terms also expressly warn that, even though Meta "work[s] hard to provide the best Products [it] can and to specify clear guidelines for everyone who uses them," Meta does "not control or direct what . . . others do," is "not responsible for their actions or conduct," and "cannot predict when issues might arise with [its] Products," including the Meta Pixel. *Id.* at 7. The Terms also state that Meta's "liability shall be limited to the fullest extent permitted by applicable law." *Id.*

***Privacy Policy.*** The Privacy Policy provides more details about "what information [Meta] collect[s]." RJN Ex. 2 at 2. It tells users that third parties can use the tools and other products Meta offers, including the Meta Pixel, to "advertise or support their products and services" and to "understand and measure how people are using their products and services and how well their ads are working." *Id.* at 17. It also specifically discloses that Meta "collect[s] and receive[s] information" from those third parties "about a variety of your information and activities on and off [Meta's] Products"—including "device information," "[p]urchases and transactions you make," "[h]ow you use [third parties'] products and services, online or in person," and "[w]ebsites you visit and cookie data, like through . . . the Meta Pixel." *Id.* at 7–8. It explains that Meta receives "information like your email address, cookies and advertising device ID" that "helps [Meta] match your activities with your account, if you have one." *Id.* at 8. The Privacy Policy discloses that third parties "collect your information when you visit their site or app or use their services," and states that Meta "require[s] each of these partners to have rights to collect, use, and disclose your information before providing any information to us." *Id.*

***Business Tools Terms.*** Meta's Business Tools Terms require web developers who use the Meta Pixel to "represent and warrant that you (and any data provider that you may use) have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data." RJN Ex. 3 at 2. They further forbid developers from sharing any "sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." *Id.* These Terms also require web developers to provide "robust and sufficiently prominent notice" to users about the developers' collection of users' data through the Meta Pixel, including "a clear and prominent notice on each web page where our pixels are used" that discloses particular details and how users can opt

out. *Id.* at 3.

### C. Plaintiffs' Allegations

On April 9, 2024, plaintiff Phyllis Nichols (an Illinois resident) filed a complaint against Meta in California Superior Court, raising a single count under the Illinois Genetic Information Privacy Act ("GIPA"). Dkt. 1. Meta removed the case to this Court and moved to dismiss for failure to state a claim. Dkts. 1, 22. Rather than respond to Meta's motion to dismiss, Nichols amended her complaint. Dkt. 26. The amended complaint adds two new plaintiffs: Robin Cook and Lawrence Novida, each California residents.

Plaintiffs are Facebook users who used GEDmatch, a company that allows its users to submit genetic test results online to explore their family history. Compl. ¶¶ 11, 29–31, 56–57, 87, 97, 107. GEDmatch is not a genetic-testing company; instead, GEDmatch users can upload genetic-test results (about themselves or others) from other companies to GEDmatch.com and then compare the information to other profiles in GEDmatch's database. *Id.* ¶ 58.

Plaintiffs allege that the Meta Pixel "operates on GEDmatch.com" pursuant to a "written agreement between [Meta] and GEDmatch." *Id.* ¶ 60. Plaintiffs claim that they each uploaded a DNA file to GEDmatch in 2017, 2021, and 2024, respectively, and that GEDmatch—through the Meta Pixel—disclosed to Meta "the fact that [they] uploaded [their] DNA file and [their] identity and, upon information and belief, [their] other interactions with the website, including how long [they] spent on particular web pages, which buttons [they] clicked on, which pages [they] viewed, and the text or phrases [they] typed into various portions of the website (such as, potentially, mitochondrial and Y haplogroup information from [their] DNA test and the name of [their] DNA test)." *Id.* ¶¶ 89, 99, 109; *see also, e.g., id.* ¶¶ 58, 60, 85, 95, 105.

Plaintiffs assert eight counts, with legal theories ranging from wiretapping to breach of contract: (1) violation of GIPA; (2) common-law intrusion upon seclusion; (3) unjust enrichment; (4) violation of section 631 of the California Invasion of Privacy Act ("CIPA"); (5) violation of section 632 of CIPA; (6) violation of the California Unfair Competition Law ("UCL"); (7) invasion of privacy under the California constitution; and (8) breach of contract. Compl. ¶¶ 135–231.

## LEGAL STANDARD

A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the complaint pleads facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). A plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 570. A claim also may be dismissed based on a dispositive issue of law. *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015).

## ARGUMENT

### I. Plaintiffs Consented To Meta's Receipt Of Their Data.

All of plaintiffs' claims fail because they consented to Meta's receipt of data reflecting their activity on third-party websites through the Meta Pixel. Consent bars liability on all of plaintiffs' claims; an individual who agrees to particular data collection cannot claim to have been wronged by it. *See, e.g.*, Cal. Penal Code §§ 631(a), 632(a) (imposing liability for wiretapping and eavesdropping "without the consent of all parties"); Cal. Civ. Code § 3515 ("He who consents to an act is not wronged by it."); *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1072 (N.D. Cal. 2016) ("[C]onsent negates an intrusion upon seclusion claim.").

Plaintiffs here allege that they are all Facebook users and acknowledge that, when they signed up for a Facebook account, they each "agree[d] to [Meta's] Terms of Service and Privacy Policy." Compl. ¶¶ 87, 97, 107, 215. Those policies contain clear and broad disclosures stating that Meta may receive data reflecting users' activity on third-party websites that use the Meta Business Tools, including the Meta Pixel. *See supra* 4–5. The Ninth Circuit has held, and recently reaffirmed, that "[a] reasonable person viewing those disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes," and "[k]nowing authorization of the practice constitutes [p]laintiffs' consent." *Smith v.*

*Facebook, Inc.*, 745 F. App'x 8, 8–9 (9th Cir. 2018); *see Lloyd v. Facebook, Inc.*, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024) (affirming dismissal of claims that Meta "impermissibly track[s] . . . online activity" because "Facebook's data policy gives clear notice that third party partners may share data with Facebook"); *see also, e.g.*, *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4–5 (N.D. Cal. July 28, 2021) (dismissing wiretapping claims where "terms plainly disclose that partners . . . may install tracking software to collect data concerning users' activities across websites"); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1211–14 (N.D. Cal. 2014) (Koh, J.) (similar). Because the data allegedly at issue here all reflects plaintiffs' activity on a third-party website that uses the Meta Business Tools, it is squarely within the scope of consent.

Some courts have nevertheless declined to follow these principles where allegedly *sensitive* data was at issue. *See, e.g.*, *In re Meta Pixel Tax Filing Cases*, 2024 WL 1251350, at *5 (N.D. Cal. Mar. 25, 2024) ("*Meta Tax*") (tax information); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) (health information). Because plaintiffs have failed to plausibly allege that GEDmatch sent sensitive information, *see infra* 10–11, that supposed exception does not apply here and plaintiffs' consent is fatal to their claims.

But even if plaintiffs had plausibly alleged that GEDmatch sent sensitive information in violation of Meta's express prohibition, the Court should not follow the cases purporting to apply that exception because they are inconsistent with Ninth Circuit precedent. The Ninth Circuit has admonished that "[a] contractual term is not ambiguous just because it is broad." *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 964 (9th Cir. 2010). It reiterated that principle just recently in assessing the scope of Google's privacy policy, rejecting a district court's narrow reading where the policy broadly "disclose[d] Google's collection of user activity data in third-party apps." *Hammerling v. Google, LLC*, 2024 WL 937247, at *2 (9th Cir. Mar. 5, 2024). The *Hammerling* court emphasized that "where a contract expressly defines a term, [a court] cannot reject that definition simply because it may deviate from [the court's] expectations." *Id.* Meta's terms broadly disclose that Meta receives data about users' activity on third-party websites, and those disclosures must be given full effect. Contrary to the analysis in *In re Meta Pixel Healthcare Litigation* and *Meta Tax*, there is no basis to further require Meta to "specifically indicate" each type of information third-party websites may convey (especially

because third parties, not Meta, decide what information to send). *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 793; *see Meta Tax*, 2024 WL 1251350, at *5. And, notably, those cases did not consider the Ninth Circuit's recent decision in *Hammerling*.

In an attempt to avoid this result, plaintiffs try to rewrite Meta's Privacy Policy, claiming that Meta "represents" that it "*only*" receives information via the Pixel when its partners have the right to share that information. Compl. ¶ 123 (emphasis added); *see also id.* ¶¶ 219–20; RJN Ex. 2. That is not what Meta's Privacy Policy says. Meta's Privacy Policy says: "We require partners to have the right to collect, use, and share your information before giving it to us." RJN Ex. 2 at 8. That is precisely what Meta does. As the Business Tools Terms show, Meta *does* contractually require every web developer who uses the Meta Pixel to "represent and warrant that [they] have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data." RJN Ex. 3 at 2. Nowhere in Meta's Privacy Policy does it say that Meta will never receive information from partners that do not have the right to share that information. *Cf. In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1013 (N.D. Cal. 2020) (Davila, J.) (concluding that Meta's "policy only represents that it would 'require' data to be deleted" and "makes no guarantees about how Facebook would enforce that requirement," noting that "*nowhere* in Facebook's data policy is there any representation that Facebook would confirm deletion"), *aff'd in part and rev'd in part on other grounds*, 87 F.4th 934 (9th Cir. 2023), *cert. granted*, No. 23-980 (U.S. 2024). Meta's terms expressly warn that—although it "specif[ies] clear guidelines for everyone who uses" its Products—Meta does "not control or direct what . . . others do," is "not responsible for their actions or conduct," and "cannot predict when issues might arise with [its] Products," including the Meta Pixel. RJN Ex. 1 at 7. In exchange for using Facebook for free, Facebook users—including plaintiffs—accept these terms and agree that Meta's "liability shall be limited to the fullest extent permitted by applicable law." *Id.*

At bottom, the possibility that some web developers might violate Meta's Business Tools Terms and send Meta unwanted data might give plaintiffs claims *against the web developers*. *See, e.g., Google Pixel*, 2024 WL 3490744, at *1 ("In many pixel cases, the plaintiffs sue the owner of the web property they interacted with, alleging that the owner installed source code that caused their personal

information to be transmitted to a third party."). But that third-party conduct does not undermine plaintiffs' assent to Meta's broad disclosures that it may receive data reflecting their activity on third-party websites or give plaintiffs a claim against Meta every time a third party violates Meta's policies.

### II. Plaintiffs' Vague Allegations Fail To Show What, If Any, Sensitive Information GEDmatch Sent To Meta About Them.

There is "nothing inherently unlawful" about the pixel technology at issue in this case, or with source-code providers like Meta "offering [their] source code" to third parties like GEDmatch. *Google Pixel*, 2024 WL 3490744, at *4. Nor is there anything inherently unlawful about GEDmatch making use of this common tool. Meta Pixel "source code can exist on one page of a website but not another," and even healthcare entities like hospitals may properly use pixels on "many" webpages without "lead[ing] to protected health information being revealed." *Id.* at *2. So too with GEDmatch—it can properly use the Meta Pixel on many pages of its website, and measure certain actions on its website, without revealing any protected genetic information about users. As a result, plaintiffs "cannot simply allege that a 'web property' contains source code and then assume this means every single page on that property contains source code." *Id.* Instead, to plausibly "support an inference" that a web developer has configured the Meta Pixel improperly to send sensitive information, plaintiffs must allege (1) "where on the web property the source code exists" and (2) what "features of [the source code] are being enabled on those pages," such as what information it is configured to share. *Id.* at *1, *2–3. Like the complaint in *Google Pixel*, the complaint here fails on both fronts.

*First*, just as the *Google Pixel* plaintiffs alleged that Google's source code appeared on various healthcare providers' "web properties," plaintiffs here generically allege that the Meta Pixel "operates on GEDmatch.com." Compl. ¶ 60; *see also, e.g.*, *id.* ¶ 88 (alleging "the GEDmatch website utilizes the Facebook Pixel"). And as in *Google Pixel*, plaintiffs assume—but do not allege facts to support—the Meta Pixel collects "all user information and actions taken on GEDMatch." *Id.* ¶ 71; *cf. Google Pixel*, 2024 WL 3490744, at *2 (rejecting plaintiffs' "assum[ption] that because there is Google source code somewhere on the health care providers' web properties, that automatically results in Google intercepting any interaction the plaintiffs have had with that website"). Plaintiffs' allegations are too vague to support the inference that GEDmatch sent sensitive information to Meta. *See Google Pixel*,

2024 WL 3490744, at *1–2 (dismissing complaint where plaintiffs' generic allegations that a given healthcare provider's "web property" used the pixel were "too vague to support an inference that the providers ha[d], contrary to [Google's] admonition, caused Google to receive the plaintiffs' personal health information").

*Second*, and also as in *Google Pixel*, "[t]his problem is compounded by the plaintiffs' failure to use precise language when describing the type of information that is allegedly transmitted." 2024 WL 3490744, at *3. For example, plaintiffs allege that the data GEDmatch sent could "potentially" include information related to their DNA tests. Compl. ¶¶ 89, 99, 109. "The use of this type of indefinite language makes it unclear what are true factual allegations and what is just speculation." *Google Pixel*, 2024 WL 3490744, at *2. Additionally, while plaintiffs assert that GEDmatch disclosed "the fact that they were subjected to genetic tests," Compl. ¶ 60, they allege no facts showing that the data the Pixel transmits tells Meta whether a user submitted *his or her own* test results or instead submitted *someone else's* test results (as is the case when, for example, law enforcement uses the GEDmatch database to find DNA matches). *See, e.g.*, *State v. Hartman*, 27 Wash. App. 2d 952, 955 (2023) (discussing law enforcement's use of GEDmatch to analyze suspect's DNA). Here, as in *Google Pixel*, plaintiffs' vague and speculative allegations make it impossible to tell whether GEDmatch sent any sensitive information to Meta.

## III. Plaintiffs Fail To Allege Meta Intended For GEDmatch To Send Sensitive Information.

Even if plaintiffs had plausibly alleged that GEDmatch used the Meta Pixel improperly to send sensitive information to Meta, they face another problem: the complaint does not plausibly allege that Meta "*intend[ed]* to receive this information." *Google Pixel*, 2024 WL 3490744, at *1 (emphasis added). Intent, or willfulness, is an element of most of plaintiffs' claims, including intrusion upon seclusion, constitutional invasion of privacy, and sections 631 and 632 of CIPA. *See* Cal. Penal Code §§ 631(a) ("willfully"), 632(a) ("intentionally"); *Google Pixel*, 2024 WL 3490744, at *7 ("intent . . . is a necessary element of an invasion of privacy claim"); *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009) (for intrusion upon seclusion, defendant must "intentionally intrude into a place,

Gibson, Dunn & Crutcher LLP

conversation, or matter as to which the plaintiff has a reasonable expectation of privacy").[3] For all of these claims, plaintiffs must plausibly allege intent to survive dismissal. Plaintiffs fail to do so.

To satisfy the intent element, the Ninth Circuit has held, plaintiffs must allege facts plausibly showing that Meta "purposefully and deliberately" acquired the communications at issue. *United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015). In other words, plaintiffs must "set forth specific factual circumstances that make plausible [Meta's] intent to record a confidential communication." *Vartanian v. VW Credit, Inc.*, 2012 WL 12326334, at *2 (C.D. Cal. Feb. 22, 2012). This standard requires "more than mere awareness that an interception might occur due to the failure of the [developer] to follow instructions." *Google Pixel*, 2024 WL 3490744, at *4. Plaintiffs must instead allege facts showing that "the defendant acted consciously and deliberately with the *goal* of intercepting" their protected information. *Christensen*, 828 F.3d at 791 (emphasis added).

Plaintiffs' allegations here fall far short of meeting that standard. The complaint recites conclusory allegations that Meta "intentionally" intercepted protected information. Compl. ¶ 205; *see also, e.g., id.* ¶¶ 24, 149, 152, 159, 175, 212. But plaintiffs do not include any well-pleaded *facts* to support that conclusion. Instead, they merely assert in conclusory fashion that Meta did not do enough "to *prevent* [its] acquisition of Private Information, including genetic information, without authorization." *Id.* ¶¶ 225–26 (emphasis added). Applying the Ninth Circuit's standard, Judge Chhabria held that it is not enough for a plaintiff to allege that a source-code provider (like Meta) "is capable of preventing the inadvertent transmission of private information . . . and that its failure to do so is reflective of an intent to obtain the information." *See Google Pixel*, 2024 WL 3490744, at *4. In *Google Pixel*, Judge Chhabria held that the plaintiffs had not plausibly alleged that Google intended to receive protected health information from hospitals that used its pixel, particularly because "Google warned [developers] that they must not use its source code in ways that would result in HIPAA-covered information being sent to Google." 2024 WL 3490744, at *4. The "takeaway" from Google's instructions,

[3] While intent is not an express element of plaintiffs' UCL claim, lack of intent means that plaintiffs are unable to identify any "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. And, as Judge Chhabria explained in *Google Pixel*, plaintiffs' unjust enrichment claim falls with the others. *See* 2024 WL 3490744, at *10 ("[B]ecause the plaintiffs have not stated a claim against Google for any unlawful conduct, they have also failed to state an unjust enrichment claim.").

Judge Chhabria reasoned, was that "Google purposefully acted so as *not* to receive any personal health information." *Id.*

So too here. Meta, like Google, contractually *forbids* web developers from sharing any sensitive information with Meta. As plaintiffs acknowledge, developers (like GEDmatch) who use the Meta Pixel enter into a contract with Meta governing their use of that tool. *See* Compl. ¶¶ 20, 71. That contract—the Meta Business Tools Terms—requires web developers to "represent and warrant that you (and any data provider that you may use) have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data." RJN Ex. 3 at 2. Further, the Business Tools Terms expressly forbid web developers from sharing with Meta "sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." *Id.* These policies are the antithesis of intent to receive protected information. Here, as in *Google Pixel*, that compels dismissal.

Meta recognizes, as Judge Chhabria did, that Judge Orrick previously adopted a lower standard for alleging intent in another case involving third parties' alleged transmission of health information to Meta. *See Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023); *see also, e.g.*, *Meta Tax*, 2024 WL 1251350, at *4 (adopting Judge Orrick's analysis in case involving tax information). Judge Orrick relied on case law suggesting that an "interception may be considered intentional where a defendant is aware of the defect causing the interception but takes no remedial action." *Doe*, 690 F. Supp. 3d at 1076 (quotation marks omitted). Judge Chhabria acknowledged but respectfully "disagree[d]" with that analysis because it is contrary to "binding" Ninth Circuit case law holding that "intentionally" means "'purposefully and deliberately.'" *Google Pixel*, 2024 WL 3490744, at *4–5 (quoting *Christensen*, 828 F.3d at 790).[4] Simply put, even if plaintiffs could plausibly allege that Meta

[4] This Court previously applied the "awareness" standard in a case involving Apple, while acknowledging the allegations in that case presented a "close" question about intent. *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684 (N.D. Cal. 2021) (White, J.). For the reasons Judge Chhabria provided in *Google Pixel*, Meta respectfully submits that legal standard is incorrect. At a minimum, though, it is limited by its own terms to cases involving a *defect* in a defendant's own product—not third-party misuse of a common tool, as plaintiffs allege here. *See id.* (involving allegedly defective "accidental Siri triggers").

was *aware* of GEDmatch's alleged violations and failed to stop them, that does not show *purposeful and deliberate* action to acquire protected genetic information. This Court should follow Judge Chhabria's thorough and correct analysis: just as a manufacturer is not liable every time a consumer allegedly misuses its product, Meta's actions in making a standard internet tool freely and publicly available do not give rise to claims against Meta whenever a developer allegedly misuses that tool in violation of Meta's terms with that developer.

## IV. Plaintiffs' Claims Fail For Numerous Other Reasons.

This Court can and should dismiss all of plaintiffs' claims for the reasons above. But in addition to those problems, the claims suffer from multiple other defects that independently compel dismissal.

### A. Plaintiffs Fail To State A GIPA Claim (Count 1).

Plaintiffs allege that Meta is liable under GIPA, which applies to entities that allegedly *disclose* protected genetic information. *See* 410 ILCS 513/30(a). Plaintiffs do not allege Meta disclosed any genetic information. Instead, they assert Meta is liable for "compell[ing]" GEDmatch to disclose information, *id.*, but that claim fails for several reasons.

*First*, GIPA does not provide any right of action against entities that allegedly compel disclosures. The provision plaintiffs rely on—section 513/30(a)—does not regulate entities like Meta who allegedly attempt to compel disclosures. Instead, it regulates entities like GEDmatch who possess protected information: it forbids them from disclosing that information, and protects them from "be[ing] compelled to disclose" it. 410 ILCS 513/30(a). This language grants legal protection for entities like GEDmatch against complying with demands for disclosure (such as a subpoena) and shields them from the consequences that might otherwise attach to refusing to comply.[5] Nowhere does the statute permit the subject of genetic testing to bring a damages suit against a person or entity, like

[5] GIPA's other provisions are of a piece. *See, e.g.*, 410 ILCS 513/30(b) (exempting entities from legal demands under Illinois's Freedom of Information Act); *id.* 513/15(a) (providing that genetic testing information shall not be "admissible as evidence, nor discoverable in any action of any kind in any court, or before any tribunal, board, agency, or person"); *id.* ("No liability shall attach to any hospital, physician, or other health care provider for compliance with the provisions of this Act").

law enforcement, that demands to see such information. As a result, GIPA provides a right of action only against GEDmatch for disclosing the information, not against Meta for receiving it.[6]

*Second*, even accepting plaintiffs' alternative version of the statute, their theory that Meta somehow "compelled" GEDmatch to disclose their genetic information is unsupported by their allegations. "An act which is compelled is one that is commonly recognized as having been *forced*, without the possibility of denying or resisting." *Los Angeles Police Protective League v. City of Los Angeles*, 35 Cal. App. 4th 1535, 1541 (1995) (emphasis added).[7] Thus, when GIPA uses the term "compel," it plainly contemplates "something more than passive receipt of information, and something more than merely 'asking' or 'requesting' action or obtaining information." *Bridges v. Blackstone Grp., Inc.*, 2022 WL 2643968, at *4 (S.D. Ill. July 8, 2022), *aff'd*, 66 F.4th 687 (7th Cir. 2023).

Plaintiffs allege that Meta "compelled" GEDmatch to disclose their protected information "when [Meta] entered into contracts with its customers (i.e. GEDmatch) to permit the disclosure of all web traffic and all user information, including the disclosure of all actions taken on their customers' website." Compl. ¶ 141. But Meta's Business Tools Terms—a standard contract that every web developer who uses the Meta Pixel agrees to—merely permit GEDmatch to use Meta's free pixel tool. RJN Ex. 3. Meta never "compelled" GEDmatch to use the Meta Pixel or to send Meta any information at all, much less information protected under GIPA. GEDmatch—not Meta—chose whether to use this tool, and if so, what information to send through it. *See supra* 3–4; *see also, e.g.*, Compl. ¶¶ 62–65. The complaint fails to plausibly allege that any provision in the Business Tools Terms "compelled" GEDmatch to send protected information to Meta, because there is none. *Cf. Bridges v. Blackstone, Inc.*, 66 F.4th 687, 690 (7th Cir. 2023) (affirming dismissal where complaint failed to allege "any term of the deal mandated prohibited disclosure"). To the contrary, the Business Tools Terms expressly *forbid* developers like GEDmatch from sharing any sensitive information with Meta. RJN Ex. 3.

[6] In fact, plaintiffs' counsel has filed a suit directly against GEDmatch in Illinois state court. *See Curley v. Verogen, Inc.*, No. 2024CH08282 (Cook Cnty. Cir. Ct. Aug. 30, 2024).

[7] "Compel" bears that same meaning in the law. Compel, *Black's Law Dictionary* (11th ed. 2019) ("To cause or bring about by force, threats, or overwhelming pressure."); Compel, *Merriam-Webster's Dictionary of Law* (2d ed. 2016) ("[T]o cause to do or occur by overwhelming pressure and esp. by authority or law.").

Accordingly, plaintiffs have failed to plausibly allege that Meta compelled GEDmatch to send protected information.

*Third*, plaintiffs' GIPA claim is also foreclosed by the choice-of-law provision in Meta's Terms of Service. Courts have routinely enforced that provision to bar out-of-state claims by Facebook users. *E.g.*, *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1055–57 (N.D. Cal. 2018) (dismissing New York law claim based on Facebook's choice-of-law clause); *Palomino v. Facebook, Inc.*, 2017 WL 76901, at *3–4 (N.D. Cal. Jan. 9, 2017) (same for New Jersey law claim); *see also, e.g.*, *In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 934–35 (N.D. Cal. 2018) (dismissing claims under laws of other states based on Google's choice-of-law clause). This Court should follow suit.

As noted above, plaintiffs allege they are Facebook users and acknowledge they "agree[d] to [Meta's] Terms of Service." Compl. ¶¶ 87, 97, 107, 215. Those Terms include a California choice-of-law clause: Meta and each user "agree . . . that the laws of the State of California will govern these Terms and any claim, cause of action, or dispute without regard to conflict of law provisions." RJN Ex. 1 at 8. That choice-of-law clause forecloses plaintiffs' invocation of an Illinois statute.

"California has a strong policy favoring enforcement of choice-of-law provisions." *Palomino*, 2017 WL 76901, at *3 (quotation marks omitted). If "the chosen state has a substantial relationship to the parties or their transaction," or if a "reasonable basis otherwise exists for the choice of law," the provision "generally will be enforced." *Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 917 (2001). An exception applies only when "application of California law would violate [a] fundamental" policy of a state with a materially greater interest in the determination of the issue. *Palomino*, 2017 WL 76901, at *3; *see Wash. Mut. Bank*, 24 Cal. 4th at 917; *Williams*, 384 F. Supp. 3d at 1056.

This Court should enforce the choice-of-law provision here under those principles. California has an "obvious substantial relationship to the parties and a reasonable basis to enforce its choice of law considering Facebook is a California corporation with its principal place of business located at Menlo Park, California." *Williams*, 384 F. Supp. 3d at 1056 (quotation marks omitted). Nor would applying California law violate any fundamental policy of Illinois. California, like Illinois, has robust privacy protections. *See, e.g.*, Cal. Civ. Code § 56.181 (genetic-privacy statute). This case is therefore unlike those where courts have declined to enforce choice-of-law clauses out of concern that California

law lacked protections comparable to other States. *See, e.g.*, *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1168–70 (N.D. Cal. 2016). That another State's laws might "afford[] different rights and remedies" is not a legally sufficient basis to refuse to enforce the parties' contractually agreed choice of law. *Palomino*, 2017 WL 76901, at *4; *see Williams*, 384 F. Supp. 3d at 1056.

No amendment can cure these issues, and the Court should dismiss this claim with prejudice.

### B. Plaintiffs Fail To State A CIPA Claim (Counts 4 And 5).

Plaintiffs allege Meta violated sections 631 and 632 of CIPA by receiving data from GEDmatch about their activity on its website. Compl. ¶¶ 169–80, 181–91. Section 631, a wiretapping provision, imposes liability on a party for intercepting "the contents or meaning" of certain wire communications. Cal. Penal Code § 631(a). Section 632, an eavesdropping provision, similarly imposes liability for eavesdropping upon a "confidential communication." *Id.* § 632(a). Both claims fail.

***No contents of a communication.*** Under section 631, plaintiffs must allege that Meta received "the *contents or meaning* of any message, report, or communication." Cal. Penal Code § 631(a) (emphasis added). This analysis "is the same as that under the federal Wiretap Act." *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (quotation marks omitted). The Ninth Circuit has held that "the term 'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

Data reflecting plaintiffs' web-browsing activity—*i.e.*, which webpages they viewed, which buttons they clicked, how long users spend on a particular webpage, and what other actions they took on that webpage, *see* Compl. ¶¶ 89, 99, 109—is not "the intended message conveyed" of any "communication" between users and web developers. *Zynga*, 750 F.3d at 1106. The only potential "contents" plaintiffs identify is "the text or phrases [users] type into various portions of the website, including their mitochondrial and Y haplogroup results from their DNA test and the kinds of DNA test users took." Compl. ¶ 66. But plaintiffs fail to adequately allege Meta received this data, because their conclusory allegations reflect their mistaken assumption—which Judge Chhabria rejected in the *Google Pixel* case—that the mere presence of pixel technology anywhere on a website results in *all* actions being tracked on every page of that website. *See supra* 10–11. That is not how the Meta Pixel

works, and plaintiffs admit as much when they allege that users of the Meta Pixel must "*choose* which types of content are tracked." Compl. ¶¶ 63–65 (emphasis added). Additionally, plaintiffs allege only "upon information and belief" that Meta "potentially" received this information. *Id.* ¶¶ 89, 99, 109. It is hornbook law that such allegations "'merely consistent with' a defendant's liability . . . 'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

***Not a "device."*** Section 632 applies to "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication." Cal. Penal Code § 632(a). But the Meta Pixel is not an "electronic amplifying or recording *device*" within the meaning of section 632. The Meta Pixel is source code. Compl. ¶ 63. As Judge Corley previously explained in interpreting a separate provision of CIPA, software code or a software application is not a "device" under the plain meaning of that term. *See Moreno v. San Francisco Bay Area Rapid Transit*, 2017 WL 6387764, at *5 (N.D. Cal. Dec. 14, 2017). Rather, Judge Corley explained, dictionaries define "device" to mean a specialized piece of *physical* equipment. For example, "Merriam-Webster defines 'device' in relevant part as 'a piece of equipment or a mechanism designed to serve a special purpose or perform a special function,' for example, 'smartphones and other electronic devices' or a 'hidden recording device.'" *Id.* (citing Device, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/device (2017)); *cf. Lopez*, 519 F. Supp. 3d at 690 (White, J.) (analyzing Section 632 claim where, even though software was involved, plaintiffs alleged the software was used to program *devices, i.e.*, iPhones).

California courts "generally presume the Legislature intended [a] word . . . to have the same meaning each time it is used" when "the same word . . . appears in different places within a statutory scheme." *People v. Braden*, 14 Cal. 5th 791, 806 (2023) (quoting *People v. Gray*, 58 Cal. 4th 901, 906 (2014)). That "well-established canon[]" applies here, where both section 632 and section 637.7 are part of the same legislative act and prohibit using a "device" to record or track information. *Id.* Construing "device" in section 632 to refer only to tangible objects abides by that canon, as well as the plain meaning of the term. And it is also consistent with the context surrounding the term. In addition to prohibiting "us[ing] an electronic amplifying or recording device to eavesdrop," section 632 also uses the term "device" in providing that the improperly recorded conversations must take place "by

means of a telegraph, telephone, or other device, except a radio." Cal. Penal Code § 632. "Telegraph" and "telephone" are tangible objects, and under the canon of *noscitur a sociis*, which provides that "a word takes meaning from the company it keeps," *see People v. Drennan*, 84 Cal. App. 4th 1349, 1355 (2000), "device" should be construed in line with those terms to refer to tangible instruments—not "bits of code" like the Meta Pixel. Compl. ¶ 63. Plaintiffs' section 632 claim should therefore be dismissed.

***No confidential communications.*** Section 632 also applies only to "confidential" communications. Cal. Penal Code § 632(a). Communications are "confidential" only if "a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Flanagan v. Flanagan*, 27 Cal. 4th 766, 777 (2002). As a threshold matter, plaintiffs' consent, *see supra* 7–10, defeats any assertion that plaintiffs had a reasonable expectation of privacy vis-a-vis their relationship with Meta and information conveyed via Meta's Pixel. *See, e.g., People v. Nakai*, 183 Cal. App. 4th 499, 518 (2010) (pointing to disclosures in Yahoo!'s privacy policy as one reason instant messages were not "confidential"). And no amendment can change the fact of plaintiffs' consent. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 956 (N.D. Cal. 2017). Moreover, "in California, courts have developed a presumption that Internet communications"—specifically including "browsing activity"—"do not reasonably give rise" to an expectation of confidentiality. *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *3 (N.D. Cal. Oct. 23, 2019) (collecting cases and holding "browsing activity" is not confidential). Here, there is "[n]othing about these particular internet communications" that "warrants a deviation from th[e] general rule." *Id.*; *see also Rodriguez v. Google LLC*, 2021 WL 2026726, at *7 (N.D. Cal. May 21, 2021) (plaintiffs "must plead unique, definite circumstances" to rebut "California's presumption against online confidentiality").[8] That is especially true given plaintiffs' failure to allege where or how the Meta Pixel is implemented on GEDmatch's website. *See supra* 10–11.

---

[8] Some courts have recently held that individuals may have a reasonable expectation of privacy for certain internet communications—for example, in situations involving communications with one's health provider. *See, e.g., M.G. v. Therapymatch, Inc.*, 2024 WL 4219992 (N.D. Cal. Sept. 16, 2024). These cases do not help plaintiffs here, for several reasons: plaintiffs consented to Meta receiving this information; they have not alleged the webpages where the pixels were placed or what data they were configured to share; and their allegations about what data was supposedly shared are purely speculative. *See supra* 7–11.

### C. Plaintiffs Fail To State A Constitutional Privacy (Count 7) Or Intrusion Upon Seclusion (Count 2) Claim.

Plaintiffs allege Meta is liable for the common-law tort of intrusion upon seclusion and for invasion of privacy under the California constitution. Compl. ¶¶ 147–60, 203–13. The common law and the California constitution "both set a high bar" for these claims, *Belluomini v. Citigroup, Inc.*, 2013 WL 3855589, at *6 (N.D. Cal. July 24, 2013), and courts typically assess them together, *see Hernandez*, 47 Cal. 4th at 288. To make out these claims, plaintiffs must allege that Meta "intentionally intrude[d] into a place, conversation or matter as to which the plaintiff has a reasonable expectation of privacy" and that the intrusion "occur[red] in a manner highly offensive to a reasonable person." *Hernandez,* 47 Cal. 4th at 286. Plaintiffs do not adequately plead either element.

***No reasonable expectation of privacy.*** This inquiry parallels the "confidential" analysis under section 632 of CIPA, which asks whether an individual had "an objectively reasonable expectation" of privacy. *Flanagan*, 27 Cal. 4th at 777. Again, plaintiffs' consent defeats any assertion that they had a reasonable expectation here. *See, e.g., Nakai,* 183 Cal. App. 4th at 518 (pointing to disclosures in Yahoo!'s privacy policy as one reason instant messages were not "confidential"). And in any event, "[c]ontemporary internet browsing involves the collection of users' data, including by tracking users across the internet, and a reasonable user should expect as much." *Hubbard v. Google LLC*, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024) (emphasis omitted). Plaintiffs cannot cure these defects with amendment. *See Smith*, 262 F. Supp. 3d at 956 ("no amendment could change the fact that Plaintiffs consented to Facebook's conduct").

***No highly offensive intrusion.*** At a minimum, any intrusion into a protected privacy interest here was not "highly offensive." That element "set[s] a high bar for an invasion of privacy claim," *Belluomini v. Citigroup Inc.*, 2013 WL 5645168, at *3 (N.D. Cal. Oct. 16, 2013) (quotation marks omitted), and confines the tort to the sort of conduct that sparks outrage in a reasonable person. "Courts in this district have held that data collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy," including "[e]ven disclosure of highly personal information." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022); *see also, e.g., Hubbard*, 2024 WL 3302066, at *7–8 (concluding online tracking is "ubiquitous, commercial

behavior" that is not "highly offensive"); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) ("Even assuming this information was transmitted without [p]laintiffs' knowledge and consent, a fact disputed by [d]efendants, such disclosure does not constitute an egregious breach of social norms."). Plaintiffs do not allege sufficient "plus factors" here to establish highly offensive conduct. *Hubbard*, 2024 WL 3302066, at *7 (quotation marks omitted). Additionally, to the extent plaintiffs allege that GEDmatch sent any sensitive information in violation of Meta's policies, *see supra* 10–11, "no cause of action will lie for accidental, misguided, or excusable acts of overstepping upon legitimate privacy rights." *Hernandez*, 47 Cal. 4th at 295. Allegedly "negligent conduct"—even with an "absolute disregard of its consequences," and even if it results in the disclosure of "highly personal information"—is not sufficiently egregious. *Razuki v. Caliber Home Loans, Inc.*, 2018 WL 2761818, at *2 (S.D. Cal. June 8, 2018) (quotation marks omitted).

### D. Plaintiffs Fail To State A UCL Claim (Count 6).

Plaintiffs allege Meta violated the UCL by engaging in "unlawful" and "unfair" practices. Compl. ¶¶ 192–202. This claim fails for multiple reasons.

***No statutory standing.*** The UCL requires plaintiffs to plead a loss of "money or property." Cal. Bus. & Prof. Code § 17204. Plaintiffs assert they lost "access to their private and personal data" and that their data has "diminished [in] value." Compl. ¶¶ 200–01. Plaintiffs also tack on a conclusory allegation that they "would have paid less" for Meta's services had they known Meta was receiving their information, *id.* ¶ 200, but there are no allegations that plaintiffs paid *anything* for Meta's (or GEDmatch's) services. *See, e.g.*, *Doe*, 690 F. Supp. 3d at 1089 ("Courts in this district have dismissed cases where . . . plaintiffs paid no money to the defendant."). And, as a long line of cases has held (including Judge Chhabria in the recent *Google Pixel* case), plaintiffs' allegations about "[t]he loss of personal data" do not establish a money-or-property loss under California law. 2024 WL 3490744, at *7 (dismissing UCL claim based on alleged interception of "health information" and collecting cases); *see also, e.g.*, *Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 615 (9th Cir. 2021) ("Several courts in this Circuit have found, and we agree, that the mere misappropriation of personal information does not establish compensable damages." (quotation marks omitted)); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 943 (N.D. Cal. 2023) (collecting cases and concluding "the weight of

the authority in the district and the state" find disclosure of personal information insufficient for UCL standing); *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 603 (N.D. Cal. 2021); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 849 (N.D. Cal. 2014). California state courts, too, have recently confirmed that any external value of personal data does not establish UCL standing where plaintiffs do "not allege they ever attempted or intended to participate in [a market for their data], or otherwise to derive economic value from their PII." *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 538 (2022) (rejecting "lost-value-of-PII theory").[9]

***Plaintiffs are not entitled to restitution or injunctive relief.*** The "remedy for a UCL violation is either injunctive relief or restitution." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1135 (9th Cir. 2014). Plaintiffs here are not entitled to either. "The restitutionary relief is limited to money or property lost by the plaintiff and acquired by the defendant," and this relief is unavailable "without any corresponding gain by the defendant." *Id.* Here, plaintiffs do not allege they paid Meta anything. Nor can plaintiffs satisfy the requirements for injunctive relief, because they are clearly now aware of GEDmatch's data-sharing practices. *See Int'l Star Registry of Ill. v. ABC Radio Network, Inc.*, 451 F. Supp. 2d 982, 991 (N.D. Ill. 2006) (rejecting Illinois consumer-protection claim and noting that "[i]n consumer actions, proving the likelihood of future harm is difficult because once the consumer has knowledge about the defendant's actions, it can easily protect itself in the future by avoiding the harm").

***No unlawful or unfair conduct.*** Plaintiffs' "unlawful" theory fails because it is predicated on the same theories underlying plaintiffs' other claims, which they have not sufficiently alleged. *See Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 896 n.5 (N.D. Cal. 2022). Their "unfair" theory requires plaintiffs to satisfy either a "balancing" test (which weighs "the utility of the defendant's conduct

[9] In *Meta Tax*, the court adopted a broad theory of UCL standing under which personal data may qualify as "property" and "[a]ny time a user transacts with a business or other entity and their expectations regarding their personal data are not met as a result of conduct alleged to violate the UCL"—including when a user obtains "free services"—"they can establish UCL standing." 2024 WL 1251350, at *24–25. As the cases cited above demonstrate, that position conflicts with the weight of authority, and this Court should reject it. *See also, e.g.*, *Google Pixel*, 2024 WL 3490744, at *7–8 (acknowledging "there are cases that support the plaintiffs' position," but finding those cases unpersuasive and the position "tenuously supported"); *Doe*, 690 F. Supp. 3d at 1089–91 (collecting cases and finding no UCL standing in case concerning hospitals' use of the Meta Pixel).

against the gravity of the harm to the alleged victim") or a "tethering" test (which requires tying a defendant's conduct "to specific constitutional, statutory, or regulatory provisions"). *Herskowitz v. Apple Inc.*, 940 F. Supp. 2d 1131, 1145–46 (N.D. Cal. 2013) (quotation marks omitted). Plaintiffs do not plead facts in support of either test; their allegations on this front are wholly conclusory and do not enable the court to meaningfully evaluate their claims. *See* Compl. ¶¶ 197–98. Additionally, because both theories are predicated on alleged deception about what information Meta would receive from GEDmatch, plaintiffs must plead—with particularity, under Rule 9(b)—actual reliance on an alleged misrepresentation. *See Perkins*, 53 F. Supp. 3d at 1219–20 (noting "this Court has consistently required allegations of actual reliance and injury at the pleading stage for claims under all three prongs of the UCL where such claims are premised on misrepresentations"). That is also fatal, because plaintiffs do "not allege that [they] read and relied on a specific misrepresentation." *Haskins v. Symantec Corp.*, 654 F. App'x 338, 339 (9th Cir. 2016); *see also Perkins*, 53 F. Supp. 3d at 1219–20. Nor do they sufficiently allege, as required for omissions-based claims, that "had the omitted information been disclosed, [they] would have been aware of it." *In re Apple Processor Litig.*, 2023 WL 5950622, at *2 (9th Cir. Sept. 13, 2023) (quotation marks omitted).

### E. Plaintiffs Fail To State An Unjust Enrichment Claim (Count 3).

Plaintiffs' conclusory assertion that Meta's receipt of plaintiffs' "highly valuable data," Compl. ¶ 163, constitutes unjust enrichment is insufficient. Addressing the same theory in *Google Pixel*, Judge Chhabria concluded that "because the plaintiffs have not stated a claim against Google for any unlawful conduct, they have also failed to state an unjust enrichment claim." 2024 WL 3490744, at *10. This Court should reach the same result. Moreover, even if any of plaintiffs' other claims were viable—and they are not—plaintiffs have not adequately pleaded that Meta acted unjustly merely by *receiving* data that GEDmatch chose to send; they have not alleged any actionable misstatements or omissions by Meta (let alone reliance on them); and they have not adequately alleged a money-or-property interest in their data that could render any receipt "inequitable." *See Lebrun v. CBS Television Studios, Inc.*, 68 Cal. App. 5th 199, 209 (2021) (unjust enrichment requires "circumstances which make it inequitable for the defendant to retain the benefit without paying for its value" (quotation marks omitted)); *Dinosaur Dev., Inc. v. White*, 216 Cal. App. 3d 1310, 1316 (1989) (no unjust enrichment unless "benefits

were conferred by *mistake, fraud, coercion or request*" (quotation marks omitted)).

***Barred by contract.*** Plaintiffs also cannot assert an unjust enrichment claim against Meta given their agreement to Meta's Terms of Service. Unjust enrichment claims "cannot lie where there exists between the parties a valid express contract covering the same subject matter." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014); *see also, e.g.*, *Alatortev v. JetBlue Airways Corp.*, 2018 WL 2735355, at *6 (N.D. Cal. June 7, 2018). To the extent plaintiffs (incorrectly) claim that Meta's receipt of their data exceeded the scope of consent established by Meta's agreements with them, that claim sounds in contract, not unjust enrichment. And as discussed *infra* 24–25, the limitation-of-liability provision to which plaintiffs agreed also bars unjust enrichment. *See Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1037 (N.D. Cal. 2019) (dismissing quasi-contract claim based on limitation of liability). Because plaintiffs allege an express contract, dismissal of the unjust enrichment claim should be with prejudice. *See In re Facebook Priv. Litig.*, 791 F. Supp. 2d 705, 718 (N.D. Cal. 2011) (dismissing unjust enrichment claim with prejudice where plaintiffs "allege that an express contract existed between themselves and Defendant").

**F. Plaintiffs Fail To State A Breach Of Contract Claim (Count 8).**

Alternatively to their unjust enrichment claim, plaintiffs bring a breach of contract claim predicated on alleged violations of Meta's Terms and Privacy Policy. That claim also fails.

***Limitation-of-liability clause.*** Meta's Terms contain a clear limitation-of-liability provision: "[Meta]'s liability *shall be limited to the fullest extent* permitted by applicable law, and under no circumstance will we be liable to you for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or the Meta Products." RJN Ex. 1 at 7–8 (emphasis added). That clause forecloses the only forms of liability plaintiffs do or could allege on their contract claims. California courts enforce such clauses "unless [they are] unconscionable." *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126 (2012). Plaintiffs do not allege that this clause is unconscionable, and another court has found it is not. *See Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1037–38 (N.D. Cal. 2019). Plaintiffs' claim is thus barred, and no amendment can save it. *See Pac. W. Grp., Inc. v. Real Time Solutions, Inc.*, 321 F. App'x 566, 569 (9th Cir. 2008) (affirming dismissal with prejudice of contract

claim where "the contract bars such claims as a matter of law").

***No breach.*** Meta's Privacy Policy says Meta "require[s] partners to have the right to collect, use and share your information before giving it to us." RJN Ex. 2 at 8; *see* Compl. ¶ 220. Plaintiffs assert Meta breached this provision "by not requiring GEDmatch to actually have the right to share [their] . . . genetic data." Compl. ¶ 222; *see also id.* ¶ 223. But the Business Tools Terms require precisely that, so Meta fulfilled its commitment, and there is accordingly no breach. RJN Ex. 3; *see supra* 5–6. To the extent plaintiffs demand more—such as "technological blocks," "requir[ing] GEDmatch to send records" to Meta, or a "monitoring system," Compl. ¶¶ 223–26—those demands are untethered to any contractual promise Meta made. Indeed, in analyzing a similar provision in Meta's Privacy Policy (then called the "Data Policy"), Judge Davila concluded that "the data policy only represents that it would 'require' data to be deleted" and "makes no guarantees about how Facebook would enforce that requirement." *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d at 1013. So too here.

Meta acknowledges that Judge Orrick allowed a breach of contract claim to survive dismissal in the healthcare case discussed above. *See Doe*, 690 F. Supp. 3d at 1083–86. Respectfully, however, the reasoning in that case is flawed. On the limitation-of-liability issue, Judge Orrick noted that Meta could "move to limit the types of damages available (*e.g.*, anything beyond nominal damages)" later in the case, but he declined to dismiss the claim because he concluded the plaintiffs pleaded (1) "entitlement to nominal damages and restitution" (which he suggested were not covered by the limitation-of-liability clause) and (2) "intentional conduct." *Id.* at 1084–85. But (1) the clause limits liability "to the fullest extent permitted by applicable law," RJN Ex. 1 at 7, and *Doe* does not explain why the law would not permit it to limit nominal damages or restitution, and (2) *Doe*'s intent analysis is contrary to Judge Chhabria's recent analysis and Ninth Circuit precedent. *See supra* 11–14. And, while Judge Orrick concluded that the plaintiffs' "specific references to identified provisions in Meta's [Terms of Service] and Privacy Policy are sufficiently definite," *Doe*, 690 F. Supp. 3d at 1086, he did not explain how any specific promises of particular enforcement mechanisms could be derived from the word "require." *Cf. In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d at 1013.

**CONCLUSION**

The Court should dismiss the amended complaint with prejudice.

DATED: October 29, 2024

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/ Lauren R. Goldman*
Lauren R. Goldman

**COOLEY LLP**

By: */s/ Michael G. Rhodes*
Michael G. Rhodes

*Attorneys for Defendant Meta Platforms, Inc.*

## CIVIL L.R. 5-1(i)(3) ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3), I, Lauren R. Goldman, hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

DATED: October 29, 2024

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/ Lauren R. Goldman*
Lauren R. Goldman